**[J-54-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 743 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated February |
| | : | 14, 2017 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| v. | : | Division at Nos. CP-51-CR-0400131- |
| | : | 1997 and CP-51-CR-0703121-1997. |
| | : | |
| RICARDO NATIVIDAD, | : | SUBMITTED: July 19, 2018 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: January 23, 2019**

This is a direct capital appeal from an order dismissing a petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§9541-9546, following an evidentiary hearing limited to one issue.[1]   Appellant Ricardo Natividad presents the Court with multiple challenges pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) (prosecution must disclose evidence favorable to the accused that is material either to guilt or punishment), none of which afford him relief.  We therefore affirm the order dismissing appellant's petition.

**I. Background**

We previously set forth the underlying facts in our opinion affirming the judgment of sentence.  *Commonwealth v. Natividad*, 773 A.2d 167, 171-73 (Pa. 2001) (*Natividad I*)

---

[1] This Court has jurisdiction over direct appeals from the grant or denial of post-conviction relief in a death penalty case.  42 Pa.C.S. §9546(d).

(Opinion Announcing the Judgment of the Court), *cert. denied*, 535 U.S. 1099 (2002). As these facts are directly relevant to the *Brady* claims raised in this appeal, we recite them again at some length:

> The evidence presented at trial established appellant's involvement in certain activities beginning at 2:00 a.m. on November 9, 1996 and continuing through to approximately 11:00 p.m., November 9, 1996. About 2:00 a.m. on November 9, 1996, Michael Havens stopped to get a sandwich at Philly's Famous Cheesesteaks at the intersection of Island and Elmwood Avenues in Philadelphia. Upon returning to his car with the sandwich, Mr. Havens was approached by two men. Mr. Havens'[s] car was a dark blue Lincoln that he recently had purchased. As Mr. Havens was entering the combination to unlock the front driver's door of the Lincoln, appellant interrupted Mr. Havens by pointing a stainless steel revolver with rubber grips at him. Another man, acting in concert with appellant, approached Mr. Havens at the same time, standing behind him while appellant faced him with the gun. Mr. Havens gave his wallet and car keys to appellant. Appellant ordered Mr. Havens into the car. When Mr. Havens hesitated, appellant threatened to kill him in the parking lot if he refused to get into the car.
>
> Mr. Havens sat in the back seat of the car. Appellant sat in the front seat of the car on the passenger side. Appellant sat facing Mr. Havens, with the gun aimed at Mr. Havens throughout the time they were in the car. Appellant's accomplice drove the vehicle. Over the next fifteen to twenty minutes, appellant repeatedly threatened to shoot Mr. Havens while demanding more money from him. Mr. Havens gave appellant and his accomplice the cash from his pocket and begged to be released from the vehicle. Appellant requested Mr. Havens'[s] money access card and that Mr. Havens access the account to get them additional funds. Mr. Havens responded that there was no money in the account as he had just paid bills. Appellant continued to threaten Mr. Havens with the firearm. Finally, the men pulled the car to the side of the road. Mr. Havens was ordered out of the car and told to prepare to die by appellant. Appellant directed Mr. Havens to turn his back and remain standing. While Mr. Havens complied, appellant fled. Upon realizing that he was alone, Mr. Havens walked to a nearby store, called for assistance and reported the incident to police.
>
> At approximately 7:00 p.m. on the evening of November 9, 1996, appellant, driving a blue Lincoln, met his friend, Byron Price, near 60th and Catherine Streets in Philadelphia. Mr. Price testified that this was the first time he had seen appellant in possession of a dark blue Lincoln. The two men planned to spend the evening together watching a boxing match. Mr. Price sat in the passenger seat of the Lincoln; appellant drove. Appellant

pulled the car into an EXXON gasoline station at the corner of 60th and [Vine] Streets. Appellant told Mr. Price to wait. While sitting in the car, Mr. Price heard a gunshot. Appellant ran back to the car with a chrome revolver in his hand. Mr. Price noticed that a man he had formerly observed standing by a car in the gas station was now lying on the ground. Dropping the gun in his lap, appellant quickly made a U-turn out of the EXXON station and sped away on 60th Street. Mr. Price asked appellant why he shot the man. Appellant replied, "he drew on me."

Mr. and Mrs. Johnson had been leaving their home across the street from the EXXON station at the time of the shooting. They were unable to identify appellant; however, they testified that the shooter left the EXXON station in a dark Lincoln. They each, independently, testified to the following observation: the victim raised his hands in the air and then fell backwards at the same time that a gunshot was heard. The shooter was wearing a lumberjack style jacket at the time of the incident. After the gunshot, the shooter jumped into the driver's side of a dark Lincoln and sped away on 60th Street.

On November 11, 1996, Philadelphia police recovered a dark blue Lincoln that had been abandoned and set on fire. From the trunk of the car, the police recovered a lumberjack style jacket. Mr. Havens identified the burnt Lincoln as the car appellant had stolen from him at gunpoint on the morning of November 9, 1996. Mr. Havens also identified the jacket recovered from the trunk of the car as his own jacket that he had left in the car at the time of the robbery.

The day after the murder, appellant made statements to several of his acquaintances taking credit for having shot the man at the EXXON station. Several weeks after the incident, appellant approached his friend Keith Smith while Mr. Smith was helping Carl Harris wash Mr. Harris's car. Mr. Harris testified that he observed Mr. Smith and appellant engage in a conversation, out of his hearing, and then walk around the corner from where Mr. Harris was standing. When Mr. Smith returned after parting from appellant, Mr. Smith had in his possession a chrome .357–Magnum firearm. Sometime in December of 1996, Mr. Smith gave a .357 revolver to his attorney, Mr. Spina. Attorney Spina immediately notified Philadelphia homicide detectives that he had the gun in his possession. The homicide detectives recovered the revolver from Mr. Spina's office and turned it over to the Philadelphia crime lab for testing.

Based on information received in their investigation, the police obtained an arrest warrant for appellant in December of 1996. However, it was not until March 17, 1997 that appellant was apprehended. Following appellant's arrest, Mr. Havens, the victim of the robbery of the Lincoln, came

to the police station to view a photographic array. Upon viewing the array, Mr. Havens positively identified a photograph of appellant.

The results of forensic and pathology reports revealed that Mr. Campbell had been shot in the head at a distance of at least two feet causing his immediate death. The fatal wound was consistent with the type of injury caused by a .357 Magnum firearm. The .357 Magnum obtained by police from the office of Mr. Spina had been fired prior to being handed over to the police. Mr. Havens identified the gun recovered from Mr. Spina's office as identical to the gun held on him by appellant during the robbery of his motor vehicle. Mr. Price identified the gun appellant possessed after shooting Mr. Campbell as similar in appearance to the gun Mr. Spina delivered to the Philadelphia police.

*Id.* (citations to trial transcripts omitted).

Appellant was charged in separate indictments for the robbery of Michael Havens and the murder of Robert Campbell. The indictments were consolidated for trial. On November 10, 1997, a jury convicted appellant of first-degree murder, carrying a firearm on a public street, two counts of possession of an instrument of crime, two counts of robbery, one count of robbery of a motor vehicle, kidnapping, and criminal conspiracy.[2] At the penalty phase, the jury returned a verdict of death after finding the aggravating circumstances — killing while in the perpetration of a felony, 42 Pa.C.S. §9711(d)(6), and a significant history of violent felony convictions, 42 Pa.C.S. §9711(d)(9) — outweighed the sole mitigating factor, appellant's life history, 42 Pa.C.S. §9711(e)(8). After the trial court denied appellant's post-verdict motions, it imposed a sentence of death for the first-degree murder conviction, and imposed additional sentences for the other charges to run concurrent to the sentence of death.

On automatic direct appeal pursuant to 42 Pa.C.S. §§722(4) and 9711(h)(1), this Court rejected appellant's five claims of trial court error in an Opinion Announcing the Judgment of the Court. *Natividad I*, 773 A.2d at 181. Thereafter, on November 25, 2002, appellant filed a first *pro se* PCRA petition. Counsel was appointed and filed an amended

---

[2] 18 Pa.C.S. §§2502(a), 6108, 907, 3701, 3702, 2901, and 903, respectively.

petition, raising twelve claims of ineffective assistance of trial counsel, trial court error, and prosecutorial misconduct. Following a two-day evidentiary hearing limited to appellant's allegations of ineffective assistance of penalty-phase counsel, the PCRA court denied the petition. This Court affirmed the order denying PCRA relief on December 27, 2007. *Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007) (*Natividad II*).

Appellant filed a second *pro se* PCRA petition on March 11, 2008, challenging PCRA counsel's stewardship in handling his first PCRA petition. On November 14, 2011, the PCRA court dismissed the second petition as untimely. Appellant did not seek further review of that order.

On June 27, 2008, appellant, now represented by the Federal Community Defender Office (FCDO), filed a petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Pennsylvania. *Natividad v. Beard*, No. 08-cv-0449 (E.D. Pa.). As part of that litigation, appellant sought discovery from the Commonwealth. Following informal negotiations over the course of several years, appellant eventually filed a formal motion for discovery in the federal court, seeking access to the Commonwealth's internal trial file, as well as the investigating homicide detective's file, or "H-file." The Commonwealth opposed the motion.

On August 19, 2011, the federal court ordered the Commonwealth to produce certain discovery, but denied appellant's request for access to the entire trial and investigatory files in the possession of the Commonwealth and the police. In response to the court's order, the Commonwealth turned over more than 200 pages of documents to appellant on March 6, 2012. *See* Appellant's Third PCRA Petition, 8/9/2012, 3 ¶10. Among those disclosed documents was a piece of paper with several roughly handwritten notations, including the following entry:

> 5635 BELMAR DOERS LEFT IN SW + GOT TAG#
> 727-8853 JOHN 'MACULLA' B/M 40's STOCKY, REDDISH HAIR

↳ TOLD MANAGER ON SUNDAY    ↳ 5'11 LT COMP
THAT HE WAS ON LOT + SAW INCIDENT

*Id.* at 3 ¶11; Exhibit B to Appellant's Third PCRA Petition (the "Maculla" note).

On June 13, 2012, over three months after the Commonwealth disclosed the "Maculla" note, an investigator hired by appellant's counsel interviewed a "John McCullough." *See* Response in Opposition to the Commonwealth's Motion to Dismiss, 8/27/2014, 3. Subsequently, on July 19, 2012, McCullough signed a declaration in which he asserted the following under penalty of perjury:

1. One day in 1996, I was driving to a laundromat on 63rd Street in West Philly. I was working as a security guard at another laundromat at 60th and Cedar and had been offered part time work at the one at 63rd and Vine. That day, my 14 year old son and I had stopped by a funeral home at 63rd and Oxford. On the way home, we stopped by the laundromat at the Exxon gas station on 63rd Street.

2. I parked my car and just as we got out of the car, I noticed three men about three cars away. One guy was tall and light skinned. He was the victim. There were two darker skinned guys there. One guy was facing the victim and had his hands on the victim's shirt. There was another guy standing to the side with a gun. I froze in my tracks so as not to draw attention to myself or my son. I stood there looking at the three men for what seemed like one and a half minutes.

3. All of a sudden, the victim pushed the guy in front of him away and I heard one or more gunshots. I then saw the two darker guys run toward an already running car. The car was dark colored.

4. After the shooting, the police came to the laundromat and I told them what I saw. At first the police were suspicious of me because I was standing so close to the crime, but did not get hurt. I was asked if I knew either of the two dark skinned men, but I said that I did not. They seemed to imply that I must have known them or else I would have been shot, too. After a while, my son and I were taken to 55th and Pine to give a statement. We sat in a hallway at the station waiting to talk to a detective. As we were waiting, we started talking to a man and woman who saw the incident and were waiting to talk to the detectives too.

5. I talked to a detective at 55th and Pine and signed a 2½ page written statement about what I saw.

6.  Sometime after the incident on 63rd Street, I became ill with a heart problem. Because of this illness, I left Philadelphia for a while to visit my sister in Virginia. While I was in Virginia, I received a long distance telephone call from a neighbor who said that there had been what looked like policemen coming by my house on Belmar Terrace. I called and left a message for the police telling them where I was. I received a return call from the police and, after I explained that I was ill and would return home after I recuperated, the policeman said they would wait until I returned.

7.  When I returned to Philadelphia, some police came by my house. They asked me if I had spoken to anyone about what I saw that night. I replied that I had been in Virginia and had not spoken to anyone. They told me that they had "got the guy" and that they were "looking for the second guy." They said that they took care of everything and did not need me.

8.  I used to work for the Greater Philadelphia Urban Affairs Coalition running summer programs for at risk youths. During one summer, [appellant] was in my programs. I got to know him and would recognize him if I saw him. Only recently did I find out that [appellant] was in prison for committing the killing I saw.

9.  [Appellant] was not one of the two men that I saw with the victim at the laundromat at 63rd and Vine Street[s].

Declaration of John McCullough, attached as Exhibit D to Appellant's Third PCRA Petition, 8/9/2012.

After obtaining McCullough's declaration, appellant filed the instant third PCRA petition on August 9, 2012. In his petition, appellant alleged the Commonwealth violated *Brady* and its progeny because it "never produced a written statement" that McCullough claimed in his declaration he gave to a detective shortly after the murder, and because it "had not even produced the note mentioning John 'Maculla[.]'" Appellant's Third PCRA Petition, 8/9/2012, 6 ¶20.[3] With regard to the "Maculla" note, appellant asserted its

_____

[3] Although appellant asserted below that the Commonwealth withheld a written statement McCullough supposedly gave to police on the night of the murder, the Commonwealth was steadfast that "there is no such statement." Commonwealth's Motion to Dismiss, 3/18/2014, 9 n.12. In fact, none has ever been discovered, and the PCRA court credited

indication that McCullough "got" the tag number of the shooter's vehicle was favorable and material because the Commonwealth alleged at trial that the car stolen from Michael Havens was the same car witnesses identified as belonging to the shooter and, thus, it "provided the evidentiary link between the two crimes." *Id.* at 6-7 ¶23. According to appellant, if he "had received evidence that a different car was involved in the shooting, he would have used it to refu[t]e the inferences of identity and motive . . . and challenge the joinder of the two cases." *Id.* at 7 ¶25.

Although appellant recognized his third petition was facially untimely, he alleged it met two timeliness exceptions set forth in the PCRA. *Id.* at 10 ¶32. First, he asserted his *Brady* claim could not have been raised sooner "as a result of government interference with the production of exculpatory information in this case." *Id.*, *citing* 42 Pa.C.S. §9545(b)(1)(i) ("the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States"). Second, he argued his claim was timely pursuant to 42 Pa.C.S. §9545(b)(1)(ii) ("the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence"), because the Commonwealth's production of the note "led to John McCullough." *Id.* Regarding Section 9545(b)(2)'s requirement that "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented[,]" appellant averred he satisfied this requirement by filing his petition "within 60 days of the date that Mr. McCullough signed the [d]eclaration, July 19, 2012, and within 60 days of the date that [appellant]'s investigator first spoke with Mr. McCullough, June 13, 2012." *Id.* at ¶33.

---

the investigating homicide detective's testimony that McCullough never gave a statement to police. *See* N.T. 5/20/2016, 51-54, 59; N.T. 7/14/2016, 61.

The Commonwealth filed a motion to dismiss appellant's petition on March 18, 2014, alleging the petition was untimely and meritless. With respect to timeliness, the Commonwealth argued appellant failed to raise his *Brady* claim within 60 days of the date it could have been raised, as required by Section 9545(b)(2). *See* Commonwealth's Motion to Dismiss, 3/18/2014, 19. In the Commonwealth's view, appellant was "required to file his petition within sixty days of March 6, 2012[,]" the date the Commonwealth turned over the "Maculla" note. *Id.*

On the merits, the Commonwealth argued the note was not material evidence that it was required to disclose under *Brady* since "[t]he notation on the scrap of paper does not reflect that 'John Maculla' identified the shooter — let alone that he identified the assailant as someone **other than** [appellant]." *Id.* at 17 (emphasis in original). Invoking prior pronouncements by this Court that there is no constitutional requirement that a prosecutor "make a complete and detailed accounting to the defense of all police investigatory work on a case," *Commonwealth v. Appel*, 689 A.2d 891, 907 (Pa. 1997) (citation omitted), the Commonwealth maintained it "had no duty under *Brady* to disclose to the defense this tattered scrap of paper from the police homicide file" which "merely reflects one of many investigatory leads in this case." *Id.*

While appellant's PCRA petition was pending in the PCRA court, appellant filed a supplemental discovery motion in federal court, again seeking access to the complete trial and investigatory files of the Commonwealth and the police. On July 9, 2014, the federal court granted appellant's request, and the Commonwealth made additional files available to appellant on August 7, 2014.

This second production of documents yielded previously undisclosed statements of three individuals: Joseph Rutherford, Cynthia Smith, and Rolston Ricardo Robinson. All three statements were taken on November 14, 1996 — five days after the murder.

Rutherford indicated in his statement that after he was released from incarceration on November 4, 1996, he went to a house located at 929 Wynnewood Road in Philadelphia with his friend Edward Maloney. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 1 pp.1-2. Michael Cupaiuolo owned and lived at the house with his girlfriend "Cindy." *Id.* at 1.[4] When Rutherford and Maloney arrived, Robinson was present, as was Kenny Hart. *Id.* at 2. Rutherford described Robinson as "a Jamaican male [who] sells crack" and "likes intimidating people." *Id.* That morning, Robinson offered to front Rutherford $40 worth of crack if Rutherford agreed to pay him $80 in return by noon. *Id.* Rutherford and Robinson "had some words" about the payment before Robinson warned Hart "it was on him" to make sure Rutherford paid in full. *Id.* When Rutherford met Hart later that day, he produced only $50, and instructed Hart to send a message to Robinson that "this was all he's getting." *Id.* Rutherford returned to Cupaiuolo's house the following day, at which point Robinson came outside and threatened to knock out the windows on Rutherford's car unless he paid him the remaining $30. *Id.* at 3. Rutherford told Robinson he would see him later and left. *Id.*

The next day, November 11, 1996, Rutherford was at his girlfriend's house when Robinson and another individual showed up with a hammer and demanded the $30. Rutherford's girlfriend paid Robinson the money. *Id.* Later that night, Rutherford went to Cupaiuolo's house where he got into an argument with Robinson and threatened to kill him. *Id.* at 3-4. Robinson responded that he would "do [Rutherford] like he did Bob down at the gas station." *Id.* at 4. Rutherford noted in his statement "[t]here was already some talk in the neighborhood about [Robinson] having something to do with Bob Campbell's killing." *Id.* at 3.

---

[4] Although Rutherford referred to Cupaiuolo's girlfriend by the name "Cindy," Cynthia Smith identified herself as Cupaiuolo's girlfriend in her statement. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 2 p.1.

The dispute between Rutherford and Robinson escalated again on the night of November 13, 1996. *Id.* at 4. Rutherford was standing outside a bar at 66th and Lebanon Streets when Robinson and two others pulled up in a car. *Id.* Rutherford and Robinson "had words" before Rutherford walked back into the bar. *Id.* A few minutes later, Maloney walked in and told Rutherford that Robinson and the other men were upset with Rutherford and had guns. *Id.* At that point, Rutherford told "the entire bar that these were the guys the cops suspected of killing Bob." *Id.* The bartender told Rutherford to call 9-1-1, which he did. *Id.* Eventually, police arrived, and Rutherford accompanied them to Cupaiuolo's house to locate Robinson. *Id.* at 5. When Robinson drove by and saw the police he sped off, but the officers pursued and eventually stopped him. *Id.* In his statement taken the next morning, Rutherford indicated "Cindy" had also "heard Rob discussing" the murder, and that Cupaiuolo "thought Rob had something to do with it." *Id.* He further stated he had previously seen Robinson in a black Lincoln, but he did not know where it was or where it came from. *Id.* at 6.

Smith explained in her statement that Cupaiuolo often let people stay in their house at 929 Wynnewood Road, including Robinson. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 2 p.1. She stated she learned of the victim's death shortly after it happened, when Robinson came into the house and turned on the news. *Id.* at 2. When Smith asked Robinson what he was doing, he replied: "[T]his is important. Didn't you hear about the guy getting shot — down at the gas station[?] You know the guy — the fucking snitch — that town watch guy Bobby Campbell." *Id.* Robinson continued discussing the news story until he left the house. *Id.* at 3. When he returned an hour later, he told Smith he had been at the scene and saw the victim had a gun and was bleeding. *Id.* He stated to Smith that he "stood over top of the guy saying 'You dumb fuck.'" *Id.* On the afternoon of November 13, 1996, Smith asked Robinson if he had

anything to do with the murder, to which he responded, "Yeah — I did it." *Id*. at 3-4. Robinson further stated "that's what happens to snitches," and that he "had to teach somebody a lesson." *Id*. at 4. After making these statements Robinson left the house, but returned approximately fifteen to twenty minutes later and offered to "loan [Smith] money for [ ] dope." *Id*. at 4. Smith felt as if Robinson was "trying to buy [her] off." *Id*.

Robinson also gave a statement to police on November 14, 1996. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 3. He stated he went to the Turf Club with his friend "C" around 7:45 p.m. on the night of the murder. *Id*. at 2. While there, Robinson bet on some horses over the course of a few hours. *Id*. When they left, Robinson passed by 63rd and Vine Streets, where he saw police at the gas station and a man lying on the ground. *Id*. He parked his car by one of the gas pumps. *Id*. There were five to ten people near the gas station, and a detective asked if anyone saw anything; Robinson heard an African American female state, "they left in a Black Lincoln." *Id*. Robinson saw the victim was "[a] white male, laying on [the] ground on his back, [with] blood near his shoulders." *Id*. at 3. He also noted the victim was wearing a jacket and had a gun in a holster on his waist. *Id*. Robinson explained he stopped at the gas station because he saw the police cars, people standing around, and a body on the ground. *Id*. He stated he stayed for only two or three minutes, and that he knew nothing about the murder. *Id*. at 3, 6.

The Commonwealth also produced certain police investigatory paperwork that had not previously been turned over to the defense and which referenced Robinson. Officer Rita Wilson described in a statement that she responded to the dispute between Rutherford and Robinson at the bar on 66th and Lebanon Streets. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 8 p.1. She noted Rutherford told

her that "Rob" had stated "we're going to do to you what we did to the guy at 63rd and Vine." *Id.* at 2.

Officer Shane Darden explained in his statement that around 4:00 a.m. on November 14, 1996 — only hours after Rutherford had given his statement to homicide detectives — Rutherford stopped him on the street and told him he had additional information about the homicide. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 7 p.1. Rutherford directed Officer Darden to Cupaiuolo's house, where the officer encountered Cupaiuolo and Tracie Durham. *Id.* Cupaiuolo explained to Officer Darden that Robinson had been telling people in Cupaiuolo's house he "was there when Campbell was shot." *Id.* Durham stated she was on a pay phone near the gas station about ten minutes prior to the homicide and saw Robinson drive by twice in a gray sedan. *Id.* at 2.

A police activity sheet prepared by the assigned homicide detective and dated November 13, 1996, also mentioned Robinson. *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 5 p.1. It stated, in relevant part:

> The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd. may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1988 Acura painted gray. The license tag was checked thru [*sic*] BMV and it was registered to a RUPERT ROBINSON at [redacted]. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate the gray Acura and several persons in the location were upset with him over drug matters.

*Id.*

Two additional statements included in the Commonwealth's production were also never previously disclosed to the defense. On November 14, 1996, Tracie Durham, after

previously speaking with Officer Darden at Cupaiuolo's house, gave a statement in which she stated she did not know about the killing but "was told by Joe [Rutherford] . . . that a guy name[d] Rob . . . did it." *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 4 p.1. She again explained she was on a pay phone outside the gas station around 9:50 p.m. on November 9, 1996, when she saw a car that "looked like Rob's silver Lexus and a gentleman that looked like Rob driving it." *Id.* She asserted she did not see the victim at the gas station. *Id.* at 2.[5]

Finally, on November 12, 1996, Richard Anderson gave a statement to police in which he stated he was not at the gas station on the night of the shooting, but that he heard from a female named Tish that another man told her people who lived at "the house at [929 Wynnewood Road] . . . [and] call themselves the Junior Black Mafia had something to do with the shooting of Mr. Campbell." *See* Appellant's Supplement to Third PCRA Petition, 10/6/2014, Exhibit 6 pp.2-3. Anderson also stated he had walked by a group of teenagers on November 10, 1996, and heard one of them say they thought it was the Junior Black Mafia who did it; Anderson took "it" to mean the shooting at the gas station. *Id.* at 4.

Based on the Commonwealth's disclosure of these various statements and documents, appellant sought leave to amend his third PCRA petition to include an additional *Brady* claim on October 6, 2014, and leave was subsequently granted without objection by the Commonwealth. N.T. 7/7/2016, 61-63. As stated by appellant, the withheld materials "identify a Rob as not only a suspect, but as the confessed killer of the victim in this case." Appellant's Supplement to Third PCRA Petition, 10/6/2014, 5 ¶17. Thus, appellant alleged, the materials "[a]lone, and in combination with the declaration of

---

[5] Durham explained to the detective she had been a drug addict since she was eleven years old and had "smoked some crack" and then "shot up some coke" about two hours before her interview. *Id.* at 1.

John McCullough that [appellant] was not the person who shot [the victim]," created "a reasonable probability of a different outcome in this trial if the Commonwealth had timely produced the evidence" to the defense. *Id.* at 12 ¶27. Regarding the timeliness of his new *Brady* claim, appellant again asserted it satisfied both the governmental interference and newly-discovered fact exceptions to the PCRA's time-bar. *Id.* at 16 ¶45, *citing* 42 Pa.C.S. §9545(b)(1)(i) and (ii). He further argued his supplemental petition was filed within 60 days of the date the Commonwealth disclosed the second batch of documents. *Id.* at ¶46.

On February 11, 2015, the Commonwealth filed a supplemental motion to dismiss. In relevant part, the Commonwealth argued appellant's new *Brady* claim failed because the leads identified in the second production of documents amounted to "nothing more than inadmissible hearsay and unsubstantiated gossip and rumor about possible suspects that police heard within the first few days after the victim's shooting[,]" each of which "police quickly eliminated . . . as having anything to do with the victim's murder." Commonwealth's Supplemental Motion to Dismiss, 2/11/2015, 21.

Appellant filed a reply to the Commonwealth's supplemental motion to dismiss on May 15, 2015, challenging the Commonwealth's authority to be the "sole arbiter of what investigatory leads are true or false and which witnesses are credible and which ones are not." Appellant's Reply in Support of Supplement to Third PCRA Petition, 5/15/2015, 5. Appellant further disputed the Commonwealth's position the withheld evidence was not material. In his view, the Commonwealth "deprived [him] of exculpatory evidence from at least three separate sources, John McCullough, Joseph Rutherford and Cynthia Smith[,]"

which evidence was material because it "exonerates him in the homicide of Robert Campbell." *Id.*[6]

On November 30, 2015, the PCRA court granted an evidentiary hearing limited to the timeliness of appellant's initial *Brady* claim predicated on the "Maculla" note. N.T. 11/30/2015, 38. The PCRA court conducted the hearing over the course of three days — April 28, 2016, May 20, 2016, and July 7, 2016. At the hearing, appellant presented only McCullough as a witness. The Commonwealth, in turn, presented John McCullough III (McCullough's son),[7] Detective James Dougherty (the assigned homicide detective),[8] and Assistant District Attorney Jason Harmon.[9]

---

[6] The Commonwealth and appellant filed additional responsive briefs on July 15, 2015, and October 1, 2015, respectively.

[7] Over the course of the three-day hearing, appellant subpoenaed the Pennsylvania Board of Probation and Parole and the Philadelphia Department of Probation and Parole, seeking any records for John McCullough III. The Commonwealth objected on the basis appellant was engaging in a "fishing expedition," and because the files would likely contain privileged mental health records. N.T. 4/28/2016, 5-6. The Commonwealth also reiterated that discovery during PCRA proceedings is limited and requires a showing of exceptional circumstances. *Id.* at 5-6, 12; *see also* Pa.R.Crim.P. 902(E)(1) ("[N]o discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances."). Following an *in camera* review, the PCRA court denied appellant's request for the records. N.T. 5/20/2016, 4-5.

[8] Detective Dougherty has no relation to the author of this opinion.

[9] Due to our disposition of this issue, we need not recount at length the testimony at the evidentiary hearing. Briefly, McCullough testified he was present at the time of the murder with his teenage son, John McCullough III. McCullough claimed he saw three men, one of whom was tall and the other two of whom had dark complexions. McCullough claimed he heard one or two gunshots and then saw two men jump into a black car; he stated he knew appellant, and that he was not one of the two men. N.T. 4/28/2016, 17-23, 85-86. McCullough further claimed he gave a statement to the police, even though none was ever discovered, and despite other police records reflecting McCullough was not recorded as having been present at the scene or interviewed immediately after the crime. *Id.* at 26-32. John McCullough III disputed his father's account that they were present at the time of the murder, explaining he never witnessed a shooting or murder, and neither had his father. N.T. 5/20/2016, 4-14. Detective Dougherty recounted his investigation in the initial days following the murder, including his efforts to follow up on the tip referenced in

On June 17, 2016, before the PCRA court ruled on appellant's *Brady* claims, appellant filed a second motion to supplement his PCRA petition, which the court also granted.[10] In that supplemental petition, appellant alleged that, pursuant to *Johnson v. United States*, __ U.S. __, 135 S.Ct. 2551 (2015), "the aggravating circumstance invoked in support of [appellant]'s death sentence, 42 Pa.C.S. §9711(d)(9), is invalid because it is unconstitutionally vague under the Eighth and Fourteenth Amendments to the United States Constitution." Appellant's Second Supplement to Third PCRA Petition, 6/17/2016, 4 ¶9. In support of the timeliness of the claims raised in his second supplemental petition, appellant relied on 42 Pa.C.S. §9545(b)(1)(iii) ("the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania . . . and has been held by that court to apply retroactively"), and argued his petition was filed "within sixty days of the date of the Supreme Court's opinion in *Welch* [*v. United States*, __ U.S. __, 136 S.Ct. 1257 (2016)], which expressly made *Johnson* retroactive." *Id.* at 6 ¶14. The Commonwealth opposed this second supplemental petition as well.

---

the "Maculla" note. *Id.* at 43-47. He explained that neither McCullough nor his son were interviewed by the police on the night of the murder; rather, an activity sheet dated November 12, 1996, contained a summary of Detective Dougherty's interview of McCullough on that date. The detective testified that at no time did McCullough claim to be a witness and that he instead stated he had not been present. *See id.* at 56 ("He positively told me he was not a witness."). As the detective explained, it became clear shortly after his conversation with McCullough that he "had no knowledge whatsoever of what happened at the gas station." N.T. 7/7/2016, 9-11, 14. Finally, Assistant District Attorney Jason Harmon testified that, as the assigned prosecutor in the Charging Unit of the Philadelphia District Attorney's Office, his decision not to charge John McCullough III when he was arrested for theft in April 2014 was due to a lack of evidence, and not because McCullough III was willing to testify against his father. *Id.* at 46-51.

[10] The PCRA court granted appellant's motion to file the second supplement to his third PCRA petition on July 7, 2016. The Commonwealth did not oppose appellant's request for leave to file. N.T. 7/7/2016, 62.

On July 14, 2016, following oral argument by the parties, the PCRA court denied relief as to appellant's original *Brady* claim concerning the "Maculla" note. N.T. 7/14/2016, 61. In so doing, the court explained it had credited the Commonwealth's witnesses and disbelieved John McCullough's testimony. *Id.* at 60-61.

On July 26, 2016, appellant requested the PCRA court revoke its July 14th order denying relief, on the basis the court had yet to adjudicate the vagueness challenge presented in appellant's second supplemental petition. The following day, the PCRA court vacated its July 14, 2016 order. Over the ensuing months, the parties filed multiple briefs related to appellant's second supplemental petition.

By order dated December 21, 2016, the PCRA court dismissed appellant's *Brady* claims as untimely and meritless, but granted penalty phase relief on appellant's claim the Section 9711(d)(9) aggravator — a significant history of violent felony convictions — was unconstitutionally vague. The Commonwealth filed a motion for reconsideration.

On January 13, 2017, the PCRA court vacated its prior order granting penalty phase relief. Thereafter, on February 14, 2017, it denied relief as to all claims raised in appellant's third PCRA petition and the supplements thereto. Appellant subsequently filed in this Court an appeal from the denial of collateral relief, which is now before us for disposition.

## II. Issues & General Principles of Law

Appellant presents five issues for our review: (1) whether the Commonwealth violated *Brady* when it withheld the note identifying John "Maculla" as an eyewitness to the homicide; (2) whether the Commonwealth violated *Brady* when it withheld evidence that another person had confessed to the killing; (3) whether appellant was prejudiced by the cumulative effect of the Commonwealth's *Brady* violations; (4) whether appellant's death sentence should be vacated because it is supported by an unconstitutionally vague

aggravating circumstance; and (5) whether the PCRA court abused its discretion by failing to grant appellant's request for the parole and probation files of John McCullough III for purposes of the PCRA evidentiary hearing. Appellant's Brief at 1-2.

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determinations are supported by the record and are free of legal error. *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Id.*

To be eligible for post-conviction relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one of several enumerated circumstances, *see* 42 Pa.C.S. §9543(a)(2), and that the claims have not been previously litigated or waived, *see* 42 Pa.C.S. §9543(a)(3). "A PCRA petition, including a second or subsequent petition, must be filed within one year of a final judgment, unless the petitioner alleges and proves that he is entitled to one of three exceptions to this general rule, and that the petition was filed within 60 days of the date the claim could have been presented[.]" *Commonwealth v. Edmiston*, 65 A.3d 339, 345 (Pa. 2013), *citing* 42 Pa.C.S. §9545(b). These limitations are mandatory and jurisdictional in nature. *Commonwealth v. Taylor*, 67 A.3d 1245, 1248 (Pa. 2013) (citations omitted).

### III. *Brady* Claims

Due process is offended when the prosecution withholds evidence favorable to the accused where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must

have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Pursuant to *Brady* and its progeny, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Instead, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quotation and citation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In evaluating whether a reasonable probability of a different outcome has been demonstrated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. A defendant thus "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Rather, a defendant need only show that the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

With these general principles relevant to our review in mind, we turn to appellant's *Brady* claims.

### A. *The "Maculla" Note*

Appellant first claims the Commonwealth violated *Brady* by failing to disclose to the defense the note referencing John "Maculla," a putative eyewitness to the murder. Appellant's Brief at 14. According to appellant, "the withheld note about John 'Maculla' affected [his] preparation for trial" because "[i]t would have led him to Mr. McCullough who in turn would have testified that he saw the shooting, knew [a]ppellant, and [a]ppellant was not one of the people involved in the shooting." *Id.* at 20.

Before addressing the merits of this claim, we must first determine if we have jurisdiction to do so. *See Commonwealth v. Stokes*, 959 A.2d 306, 310 (Pa. 2008) (merits of *Brady* claim may not be addressed until it is established petition was timely filed). Appellant filed the instant PCRA petition, his third, on August 9, 2012 — well after his judgment of sentence became final. Recognizing his petition was untimely on its face, appellant argued below that the alleged *Brady* violation fell within the timeliness exceptions set forth at 42 Pa.C.S. §9545(b)(1)(i) and (ii). *See* Appellant's Third PCRA Petition, 8/9/2012, 10 ¶32. More specifically, appellant alleged the Commonwealth interfered with his ability to bring his *Brady* claim by withholding the note prior to trial, and by refusing to turn it over until the federal court ordered the Commonwealth to produce it. *Id.* Appellant noted in his petition that, in a letter dated April 17, 1997, the Commonwealth represented to the defense it had voluntarily turned over "the names and addresses of all eyewitnesses[.]" *See* Appellant's Third PCRA Petition, 8/9/2012, 2-3 ¶7-8. Appellant further asserted his petition satisfied the newly-discovered fact exception, since the disclosure of the note led to appellant's investigator "finding John McCullough who provided a written statement on July 19, 2012." *Id.* at 10 ¶32. Appellant continued that

his petition also met Section 9545(b)(2)'s separate requirement that the petition be filed within 60 days of the date the claim could have been presented, as it was filed within 60 days of the date appellant's investigator first spoke with, and then obtained a declaration from, McCullough. *Id.* at ¶33.

The Commonwealth contested the timeliness of appellant's petition in its motion to dismiss. As particularly relevant here, with respect to Section 9545(b)(2)'s requirement that the petition be filed within 60 days of when the claim could have been raised, the Commonwealth argued appellant was required to file his petition within 60 days of March 6, 2012, the date it turned over the "Maculla" note. *See* Commonwealth's Motion to Dismiss, 3/18/2014, 19. Thus, because appellant did not file his petition until August 9, 2012 — more than three months after the 60-day period had elapsed — the Commonwealth argued it was untimely. *Id.*

In response, appellant countered that "[n]o claim could have been raised" prior to locating McCullough because "[t]he disclosure of the name[ ], without more, is not by itself exculpatory and would not give rise to a *Brady* claim." *See* Response in Opposition to the Commonwealth's Motion to Dismiss, 8/27/2014, 3. Instead, he argued, "[i]t was not until [he] investigated that information, located the witness (after fifteen years) and spoke to him that the exculpatory nature of the information came to the surface." *Id.*

We begin by noting it is unclear whether the PCRA court determined appellant's *Brady* claim pertaining to the "Maculla" note was untimely and, if so, on what basis. However, the court held an evidentiary hearing on this claim precisely to determine whether it was timely, after which it denied relief. N.T. 11/30/2015, 38; N.T. 7/14/2016, 61.[11] In its final order dated February 14, 2017, the PCRA court indicated it had dismissed

---

[11] In his brief, appellant asserts the Commonwealth sent a letter to the PCRA court in which it conceded a hearing on the timeliness of appellant's petition was not necessary. Appellant's Brief at 8, 26. This letter, which appellant attaches to his brief to this Court,

the petition as untimely. Later, in its Pa.R.A.P. 1925(a) opinion, the PCRA court again indicated the petition was untimely, *see* PCRA Ct. Opinion, 8/9/2017, slip op. at 5, but also noted the "*Brady* issues, if correct, would fall under 42 Pa.C.S. [§]9545(b)(1)(i) [(governmental interference exception)] and possibly [§]9545(b)(1)(ii) [(newly-discovered fact exception)]," *id.* at 6. Appellant now contends that, "[t]o the extent the court found [his petition] untimely, the court erred." Appellant's Brief at 24. We disagree.

It is well-settled a *Brady* violation may fall within the governmental interference exception. *Commonwealth v. Breakiron*, 781 A.2d 94, 98 (Pa. 2001). Nevertheless, "a petition invoking the exception must be filed within 60 days of the date the claim could have been filed pursuant to [S]ection 9545(b)(2)." *Id.* (citation omitted). The same is true of a petition invoking the newly-discovered fact exception. *Commonwealth v. Bennett*, 930 A.2d 1264, 1272 n.11 (Pa. 2007).

Here, appellant raised a single claim in his initial petition: that the Commonwealth violated *Brady*, and thereby offended his due process rights, by failing to disclose favorable evidence that was material either to his guilt or punishment. *See* Appellant's Third PCRA Petition, 8/9/2012, 2-8, 10 ¶¶7-28, 34; *see also* 42 Pa.C.S. §9543(a)(2)(i) (a petitioner may obtain post-conviction relief where he pleads and proves by a preponderance of the evidence that his conviction or sentence resulted from "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States

expressly states the Commonwealth was **not** conceding timeliness, but was merely stipulating to the testimony of two proposed witnesses. *See* Exhibit C to Appellant's Brief. The Commonwealth does not reiterate in its brief the timeliness arguments it raised below, except for its reference to the PCRA court's order denying appellant's petition as untimely. Commonwealth's Brief at 16 n.12. In any event, this does not impede our independent jurisdictional review. *See Commonwealth v. Chester*, 895 A.2d 520, 522 (Pa. 2006) ("[I]f a PCRA petition is untimely, neither this Court nor the trial court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal authority to address the substantive claims.") (quotation and citation omitted).

which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place").[12] Accordingly, to be considered timely, whether under the governmental interference or newly-discovered fact exceptions, appellant's petition must have been filed within 60 days of the date his *Brady* claim could have been presented. 42 Pa.C.S. §9545(b)(2).

We conclude appellant failed to meet this requirement. Although he filed his petition within 60 days of the date his investigator located and secured a favorable declaration from McCullough, his *Brady* claim was predicated on the Commonwealth's suppression of **the "Maculla" note**, not its failure to disclose the statement McCullough gave to the defense 15 years later. As it was the disclosure of the note that formed the basis of appellant's due process claim, Section 9545(b)(2)'s 60-day filing requirement was triggered on the date the Commonwealth produced the note to the defense: March 6, 2012. Because appellant did not raise his *Brady* claim until August 9, 2012, his petition was untimely.

In making this determination, we reject appellant's argument that "[n]o claim could have been raised" within 60 days of March 6, 2012, on the basis that the note, "without more, is not by itself exculpatory and would not give rise to a *Brady* claim." *See* Response in Opposition to the Commonwealth's Motion to Dismiss, 8/27/2014, 3. This assertion is directly contrary to appellant's prior claims in his petition. There, as previously discussed, appellant argued the note itself was material evidence that the Commonwealth was required to disclose pursuant to *Brady*, because it identified John "Maculla" as an eyewitness and, more pointedly, indicated he "got [the] tag #" of the car involved in the

---

[12] Appellant also asserted, in passing, that "to the extent [prior] counsel became aware of, or should have become aware of, the statement by John McCullough . . . but failed to use this information on [appellant]'s behalf," they were ineffective. Appellant's Third PCRA Petition, 8/9/2012, 8-9 ¶30. Appellant did not pursue an ineffectiveness claim further, and one is not before this Court.

homicide. *See* Appellant's Third PCRA Petition, 8/9/2012, 6 ¶22. Appellant argued this evidence was material because it may have led to "evidence that a different car was involved in the shooting," which "he would have used [ ] to refu[t]e the inferences of identity and motive[.]" *Id.* at 7 ¶25. Appellant no longer espouses this theory, presumably because it defeats his assertion that the claim could not have been raised sooner.

Moreover, while we recognize McCullough's declaration certainly was evidence favorable to appellant, we reiterate it was merely additional proof supporting the merits of appellant's claim the Commonwealth violated his due process rights by withholding the note identifying McCullough as an eyewitness; it was not, however, the basis of the *Brady* claim itself. It was the disclosure of the "Maculla" note, rather than the discovery of the declaration, that informed the basis of appellant's *Brady* claim, and it was incumbent upon him to file his petition within 60 days of the date he received that material alerting him of that claim. Nothing prevented appellant from filing his *Brady* claim within 60 days of receiving the note, and Section 9545(b)(2) required that he do so. Consequently, we lack jurisdiction to consider the merits of this untimely *Brady* claim.[13]

### B. *The Robinson Documents*

#### *1. Timeliness*

---

[13] We emphasize that our timeliness analysis with respect to this issue is limited by the nature of appellant's claim, *i.e.*, a due process violation under *Brady* pursuant to 42 Pa.C.S. §9543(a)(2)(i). Arguably, had appellant raised a claim pursuant to Section 9543(a)(2)(vi), which permits relief where a petitioner pleads and proves the unavailability at the time of trial of exculpatory evidence that has subsequently become available, his petition would have been timely. This is so because appellant's petition was filed within 60 days of the date McCullough provided his declaration, and the facts alleged within that declaration were previously unknown to appellant and could not have been ascertained sooner by the exercise of due diligence. *See* 42 Pa.C.S. §9545(b)(1)(ii). Nevertheless, even if appellant had properly raised such a claim, it would not have entitled him to relief given the PCRA court's determination McCullough was not credible. *See, e.g.*, *Commonwealth v. Parker*, 431 A.2d 216, 218 (Pa. 1981) (incredible testimony pertaining to after-discovered evidence would not likely compel a different verdict).

Unlike his claim premised on the "Maculla" note, appellant's *Brady* claim regarding the evidence of another potential suspect was raised within 60 days of the Commonwealth's disclosure of that material. Pursuant to the federal court's July 9, 2014 order instructing the Commonwealth to grant appellant access to its file and the homicide detective's H-file, the Commonwealth made the files available to appellant on August 7, 2014. Within 60 days of that date, on October 6, 2014, appellant filed his supplemental petition raising the additional *Brady* claim. He has therefore satisfied 42 Pa.C.S. §9545(b)(2) regarding this claim.

In addition, our review reveals appellant satisfied an exception to the PCRA's time-bar with respect to this claim, as the facts upon which his *Brady* claim were predicated — that the Commonwealth withheld evidence pertaining to another suspect — were unknown to him until the Commonwealth was forced to open its files on August 7, 2014. 42 Pa.C.S. §9545(b)(1)(ii). Accordingly, we have jurisdiction to consider this claim, and we proceed to the arguments of the parties.

## 2. Arguments

Appellant claims the Commonwealth violated *Brady* by failing to disclose the statements indicating Robinson confessed to the murder, and also by suppressing certain police paperwork showing the police investigated those allegations against Robinson. *See* Appellant's Brief at 27-42. This evidence "of another person's culpability," appellant contends, "was favorable to the defense, yet the prosecution did not disclose any of it to the defense at trial." *Id.* at 36. Thus, appellant argues the first two prongs of the *Brady* test — the government suppressed evidence, and the evidence was favorable to the accused — "are easily met." *Id.*

Appellant also claims the suppressed evidence was material. He notes the withheld statements demonstrate Robinson "confessed to the killing to at least two

different people[,]" Rutherford and Smith, each of whom "promptly reported the confessions to both the police and other people." *Id.* at 37. Appellant continues that Robinson had a motive to kill the victim because Robinson was selling drugs out of a house in the neighborhood where the victim was associated with Town Watch. *Id.* In this regard, appellant highlights the fact Robinson once referred to the victim as a "snitch," and notes several of the suppressed reports showed Robinson had access to guns and had previously threatened people with them. *Id.* Finally, appellant observes Rutherford, in his statement, indicated he had previously seen Robinson in a black Lincoln, "the same type of vehicle described by witnesses" as belonging to the shooter. *Id.* Appellant concludes this evidence "would have been more than sufficient to charge and convict" Robinson of the murder. *Id.*

In terms of proving materiality, appellant alleges this evidence satisfies the *Brady* standard because, if the Commonwealth had provided it prior to trial, it "would have allowed competent defense counsel to argue that [Robinson] was the real killer." *Id.* at 37-38. In appellant's view, "[e]vidence that another person confessed to the crime is unquestionably exculpatory and material." *Id.* at 27, *citing Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 304-05, 311 (3d Cir. 2016) (*en banc*) (suppressed evidence would have allowed defense counsel to argue another person committed the crime). Appellant further asserts "[c]ounsel would also have been able to challenge the adequacy of the police investigation," *id.* at 38, as "[p]olice reports that corroborate the details of that confession are likewise exculpatory." *Id.* at 27-28, *citing Smith v. Sec'y of N.M. Dep't of Corr.,* 50 F.3d 801, 830 (10th Cir. 1995) ("[W]hile the knowledge the police were investigating [another suspect] would arguably carry significant weight with the jury in and of itself, that fact would also have been useful in discrediting the caliber of the investigation or the decision to charge the defendant[.]") (quotation and citation omitted).

Finally, appellant argues the PCRA court applied an improper standard of materiality by focusing on whether the documents "would have made a difference" in the jury's verdict. *Id.* at 41, *citing* PCRA Ct. Opinion, 8/9/2017, slip op. at 8.[14] According to appellant, the PCRA court's focus should have been on whether the Commonwealth's suppression of the evidence had "any adverse effect . . . on the preparation or presentation of [appellant]'s case." *Id.* at 41, *quoting Bagley*, 473 U.S. at 683. Under this standard, he argues, the suppressed evidence meets *Brady*'s materiality requirement because "[t]he entire course of the defense would have been changed" had it been disclosed. *Id.* at 42. In this respect, appellant notes there was "no evidence to suggest that anyone other than [appellant] had committed the offense" and, thus, "counsel chose to raise a self-defense case, based on Price's testimony that the deceased had drawn his weapon." *Id.* at 41-42. Appellant asserts that "[h]ad counsel been provided with the evidence of [Robinson]'s confession, he could have challenged the credibility of Price's testimony . . . and argued that [Robinson] was the actual perpetrator." *Id.* at 42.

The Commonwealth responds that appellant's *Brady* claim "plainly fails on materiality grounds." Commonwealth's Brief at 31.[15] Regarding the evidence concerning Robinson's confessions, the Commonwealth argues that, even if it had been disclosed, it would not have had a reasonable probability of affecting the verdict. It notes that not only

---

[14] In its Rule 1925(a) opinion, the PCRA court gave little discussion to the merits of appellant's *Brady* claim regarding the Robinson materials, as it deemed the "Maculla" claim the "principal *Brady* complaint[.]" PCRA Ct. Opinion, 8/9/2017, slip op. at 7. However, it did note appellant "failed to develop the remaining *Brady* claims" or support them with any testimony, and concluded appellant "failed to show how any of these claims would have made a difference in the verdict" given the "overwhelming" evidence against appellant. *Id.* at 8-9; *see also id.* at 8 (concluding appellant's *Brady* claims are "not material").

[15] The Commonwealth does not concede jurisdiction or that appellant has satisfied the first and second prongs of *Brady* with respect to this claim, but "[a]ssum[es] solely for argument's sake" those requirements have been met. Commonwealth's Brief at 31.

did Robinson provide an alibi for the murder, but "Rutherford and his associates were the apparent sources of all of the multi-layered hearsay contained in the statements, which reflected obvious animus toward Robinson based on his collection of drug debts." *Id.* at 35. In the Commonwealth's view, it would not "surprise jurors that a drug dealer cultivating a violent image to aid such collection efforts had a business reason to falsely boast about being involved in a well-publicized local crime until being questioned by police." *Id.* The Commonwealth concludes: "Viewing the evidence in its entirety, the gossip circulating in early November 1997 among a group of people who did not witness the murder and had scores to settle with Robinson over his business practices would not satisfy *Brady*'s materiality requirement." *Id.* at 42.

Turning to appellant's claim the statements and police paperwork would have enabled him to challenge the adequacy of the police investigation, the Commonwealth highlights additional documents disclosed pursuant to the discovery order showing the police promptly investigated all tips relating to possible perpetrators during the early days of the investigation and quickly eliminated them as viable suspects. *See id.* at 35-38. As the Commonwealth explains, any "[a]ttacks on the integrity of the police investigation would thus have prompted additional Commonwealth testimony outlining these efforts." *Id.* at 38. The Commonwealth notes as well that appellant's proposed use of the statements would have resulted in a renewed focus on the rapid accumulation of evidence indicating appellant's guilt, which police collected while simultaneously investigating the other early leads. *See id.* at 38-41 (setting forth a chronology of the police investigation and detailing the evidence demonstrating appellant's identity as the shooter). The Commonwealth submits that, as the investigation evolved, "it became clear that the carjacker of Michael Havens and the shooter of Robert Campbell were the same person, that [appellant] was that lone perpetrator, that he shot the victim in front of three witnesses

(Bryon Price, Martin Johnson, and Beth Johnson) while wearing Mr. Haven[s]'s distinctive lumberjack shirt, that — after being seen driving the stolen Lincoln by several people — he later tried to destroy it and the shirt by setting the vehicle on fire, and that he sold the murder/carjacking weapon to Keith Smith." *Id.* at 42.

The Commonwealth next disputes appellant's position it would have been preferable for him to use the evidence to posit an "alternate perpetrator" defense, rather than the theory of self-defense he presented at trial. *Id.* at 42-43. The Commonwealth avers this "*post hoc* evaluation warrants skepticism" because it "ignores the central problem facing the defense: namely, that [appellant]'s presence at the scene of the murder and his participation in it was firmly established by testimonial and physical evidence." *Id.* at 43. In this vein, the Commonwealth reiterates appellant was identified as the shooter by one eyewitness who knew him (Bryon Price) and by two others (Martin and Beth Johnson) who identified him by means of the distinctive lumberjack shirt taken during the carjacking of Michael Havens, who also positively identified him. *Id.* Additionally, appellant was "later seen in possession of the distinctive gun used in both crimes before selling it in a highly inculpatory fashion and was repeatedly seen driving the stolen get-away car before it was set on fire." *Id.* In the context of this evidence, the Commonwealth concludes appellant's "suggestion that he had a reasonable probability of being acquitted if only defense counsel had advanced an alternative perpetrator defense unsupported by any testimony — whether instead of, or in addition to, his claim [of] self-defense — defies the record and common sense." *Id.* (footnote omitted).

In his reply brief, appellant repeats the general thrust of his argument that the suppressed evidence was material because it "would have not only allowed defense counsel to raise a reasonable doubt about [appellant]'s guilt but would have allowed him to dramatically shift strategy from a very weak self-defense theory to a much stronger

defense that [Robinson], a drug dealer with a motive to kill, was the actual perpetrator." Appellant's Reply Brief at 5. In support, appellant relies on *Dennis*, *supra*, in which the United States Court of Appeals for the Third Circuit concluded evidence of a witness's prior inconsistent statement was material because the evidence "'would have enabled defense counsel to raise a defense he was otherwise unable to present — that [another person] committed the murder.'" *Id.* at 6, *quoting Dennis*, 834 F.3d at 304-05. Appellant argues the same reasoning should apply here.

### 3. Analysis

We need not belabor our discussion of whether appellant has satisfied the first two components of *Brady*: without a doubt, the trove of statements and investigatory paperwork revealed during the federal discovery process were suppressed by the government and favorable to appellant. There is no dispute the Commonwealth failed to disclose these materials to the defense prior to trial,[16] and some of them were plainly exculpatory on their face, as they identified an alternate suspect who allegedly claimed responsibility for the murder. *Brady*'s first two requirements are therefore clearly satisfied.

The question that remains is whether, even considering the improperly withheld material, appellant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Although we deem it to be a close call, after a careful review of the entire record, we agree with the PCRA court that the Commonwealth's evidence against appellant was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different. *See* PCRA Ct. Opinion, 8/9/2017, slip

---

[16] We recognize the omitted materials were contained within the internal "H-file" of the police, rather than the Commonwealth's file. *See* Commonwealth's Brief at 13. This, however, does not relieve the Commonwealth of its duty under *Brady*. *See Strickler*, 527 U.S. at 280-81 ("[T]he rule encompasses evidence 'known only to police investigators and not to the prosecutor.'"), *quoting Kyles*, 514 U.S. at 438.

op. at 8-9. In reaching this conclusion we begin, as we must, by considering the omitted evidence "in the context of the entire record[,]" for "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Agurs*, 427 U.S. at 112-13.

With this in mind, we highlight at the outset that, while appellant's *Brady* claim implicates his identity as Campbell's killer, the criminal episode resulting in Campbell's death began much earlier that day. At trial, the Commonwealth produced evidence that appellant, along with another unidentified individual, carjacked Michael Havens in the early morning hours of November 9, 1996. N.T. 11/5/1997, 146-54. During that encounter, appellant pointed a stainless steel revolver at Havens, forced him to surrender his wallet and keys, and ordered him into his own car — a dark blue Lincoln. *Id.* at 148-52. Havens sat in the back seat and appellant sat in the front passenger seat, facing and pointing his gun at Havens while appellant's accomplice drove. *Id.* at 150. Dissatisfied with the amount of money in Havens's wallet, appellant threatened to kill Havens if he did not produce more. *Id.* at 152. When Havens convinced appellant he had no additional money available in his bank account, appellant and his accomplice abandoned Havens on the side of a road and drove away in his car, which contained a distinctive lumberjack-style jacket inside. *Id.* at 152-53, 157-58.

Havens's identification of appellant as the assailant who carjacked him, pointed a gun at his face, and threatened to kill him before speeding off in his Lincoln was unwavering. He identified appellant from a photo array and at the preliminary hearing. *Id.* at 173, 193. When Havens identified appellant as his armed carjacker at trial, he explained he had no difficulty seeing appellant's face while being held hostage at gunpoint for fifteen to twenty minutes, as he was within one foot of him and the dome light was on inside the car as appellant counted his money. *Id.* at 153-54. As to Havens's confidence

in his identification of appellant as the carjacker, he testified "there's no doubt in my mind. I know that he did it. I know that it's him." *Id*. at 174.

With regard to the murder, the Commonwealth presented two witnesses at trial, Martin and Beth Johnson, who were leaving their home across from the brightly-lit gas station when they heard a gunshot. N.T. 11/6/1997, 76-78, 94. At that moment they observed Campbell fall backward with his hands raised in the air. *Id*. at 78, 94. The Johnsons then saw the shooter, who was wearing a lumberjack-style jacket, flee into the driver's side of a dark Lincoln and speed off. *Id*. at 78, 82, 85, 94-95.

Byron Price testified appellant picked him up around 7:00 p.m. the evening of the murder in a blue Lincoln he had never before seen appellant drive. N.T. 11/6/1997, 6-7, 12. Appellant then drove them to the gas station and exited the car, but instructed Price to wait in the passenger seat. *Id*. at 9. Price testified to hearing a gunshot, then seeing appellant run back to the car with a chrome revolver in his hand. *Id*. at 9-10, 13. At that time Price observed Campbell lying on the ground next to a gas pump. *Id*. at 13. When appellant swiftly made a U-turn out of the gas station and sped away, Price asked him why he shot the man. *Id*. at 14-15. Appellant replied: "He drew on me." *Id*. at 15.

The Commonwealth also presented testimony that appellant admitted killing Campbell to his friends the next day. While seated in the stolen Lincoln and talking to a group of approximately fifteen people, appellant announced, "You know I got that body, the town watch man." *Id*. at 181-82. Still driving around in the Lincoln, appellant later encountered his friend Robert Golatt. *Id*. at 163. Appellant told Golatt "that he was at the service station and some, you know, the guy drawed [*sic*] on him and he, you know, popped him first." *Id*. at 165. Appellant admitted he had used a chrome .357 handgun — a caliber consistent with the fatal gunshot wound to the victim's head. *Id*.; N.T.

11/5/1997, 232. As a result of appellant's bragging, it became common knowledge "on the street" he had murdered Campbell. N.T. 11/6/1996, 164.

There was also evidence presented at trial that, about a week or two after the murder, appellant sold his chrome .357 revolver to Keith Smith. *Id.* at 107-18; N.T. 11/7/1997, 42-43. Smith subsequently turned the gun over to his lawyer, who immediately relinquished it to police. N.T. 11/7/1997, 14-17. Havens identified the gun at trial as identical to the one appellant had used in the carjacking, while Price identified it as similar in appearance to the one appellant used to kill Campbell. N.T. 11/5/1997, 170; N.T. 11/6/1997, 13, 115-16.

Price's girlfriend testified against appellant as well. She explained that she called a Crime Stoppers Tip Line prior to December 25, 1996, and identified appellant as Campbell's killer. N.T. 11/6/1997, 153-54. Appellant subsequently called her, admitted to killing the victim, and boasted there was no evidence against him. *Id.* at 154-56.

Finally, the Commonwealth presented evidence that appellant evaded police after they secured a warrant for his arrest. When police eventually located appellant he fled and, once captured, gave the officers a false name, inaccurate address, and multiple dates of birth. N.T. 11/7/1997, 57-88, 100-08, 118-20.

Against the backdrop of this extensive evidence of appellant's guilt, we now consider the material revealed in 2014 in response to the federal court's order. Although appellant emphasizes numerous statements and investigatory documents that were withheld by the Commonwealth, they largely derive from a single event: the dispute over Robinson's collection of drug debts from individuals associated with the house located at 929 Wynnewood Road. After Robinson repeatedly threatened Rutherford for failing to pay a drug debt owed to him, Rutherford and Smith came forward to report Robinson had confessed his supposed involvement in the murder. The vast majority of the remaining

withheld statements and investigatory reports merely document the dispute between Rutherford and Robinson or regurgitate Rutherford's and Smith's claims Robinson confessed to being the killer. Two notable exceptions include Rutherford's vague description he had, at some unknown point in the past, seen Robinson in a Lincoln, and Durham's assertion she was at a pay phone near the gas station around the time of the murder and saw what appeared to be Robinson drive by in his gray vehicle, which was either a Lexus or an Acura.

Upon careful examination of the withheld material in the context of the entire record, we cannot say the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Kyles*, 514 U.S. at 434-35. While we do not discount the exculpatory power a third-party's confession — even one reported through yet another party — may have in an ordinary case, in the context of the other evidence presented at this particular trial, the withheld evidence regarding Robinson is "too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards." *Turner v. United States*, __ U.S. __, 137 S.Ct. 1885, 1894 (2017).

In reaching this conclusion, we "bear in mind that not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." *Kyles*, 514 U.S. at 451. Mindful of that instruction, we agree with the Commonwealth that appellant "ignores the central problem facing the defense: namely, that [appellant]'s presence at the scene of the murder was firmly established by testimonial and physical evidence." Commonwealth's Brief at 43. Indeed, our careful review leads us to the inescapable conclusion that, whatever evidentiary value the material regarding Robinson may have in its own right, it does nothing to weaken the main evidentiary points raised at trial. *Cf. Kyles*, 514 U.S. at 451 (evidence was material where "the physical evidence remaining

unscathed [by the withheld evidence] would . . . hardly have amounted to overwhelming proof that [the defendant] was the murderer").[17]

Critically, the withheld material in no way calls into question any of the evidence proving appellant was the culprit who carjacked Havens. And the unchallenged evidence

---

[17] Of course, we do not mean to imply appellant was required to demonstrate that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. In fact, "none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone[,]" *id.* at 435 n.8, and we do not make it so here. Rather, our analysis is confined, as it must be, to evaluating the withheld evidence in the context of the entire record and determining in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *See Turner*, 137 S.Ct. at 1893, *citing Cone v. Bell*, 556 U.S. 449, 469-70 (2009) and *Agurs*, 427 U.S. at 112.

The dissent disputes our application of the *Brady* standards, contending we "engage[ ] in something more closely resembling a sufficiency analysis[.]" Dissenting Opinion, slip op. at 6. Respectfully, we do nothing of the sort. As we have explained, we consider the omitted evidence "in the context of the entire record[,]" as the law demands. *Agurs*, 427 U.S. at 112; *see also id.* at 112-13 ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial."). Moreover, contrary to the dissent's suggestion, we do not "discount the exculpatory statements of Rutherford and Smith," nor do we make any credibility determinations. Dissenting Opinion, slip op. at 7. Again, we reiterate our analysis is limited to considering the exculpatory evidence in the context of the entire record, as United States Supreme Court precedent requires. In fact, it is perplexing that the dissent suggests the materiality principles announced in *Agurs* are no longer good law, *see id.* at 6 n.3, when the Supreme Court itself repeatedly and extensively relied upon them in its most recent decision applying *Brady*. *See Turner*, 137 S.Ct. at 1893 ("We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' *Agurs*, *supra*, at 112, and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' *Cone, supra*, at 470[.]"); *id.* at 1894 ("Considering the withheld evidence 'in the context of the entire record,' however, *Agurs*, *supra*, at 112, we conclude that it is too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards."); *id.* at 1895 ("We conclude only that in the context of this trial, with respect to these witnesses, the cumulative effect of the withheld evidence is insufficient to undermine confidence in the jury's verdict[.]") (internal quotation and citation omitted). Thus, it is the dissent's analysis, rather than ours, that misapplies the relevant *Brady* precedent, by focusing exclusively on the nature of the omitted evidence, divorced from the overwhelming evidence of appellant's guilt contained in the trial record.

from that crime — the hijacked Lincoln, appellant's chrome .357 revolver, and the stolen lumberjack jacket — directly connected appellant to Campbell's shooting only hours later. Perhaps even more damning, yet also unaffected by the withheld material, was Price's eyewitness testimony that appellant killed Campbell and then explained to Price he did so because Campbell allegedly "drew on him." There was also, of course, the evidence that appellant sold his chrome revolver shortly after the murder; bragged to a large group of people he was the killer while sitting in Havens's stolen Lincoln; told Price's girlfriend he killed Campbell and boasted there was no evidence against him; and evaded police for months and gave false information regarding his identity when he was finally apprehended. None of this evidence admitted at trial is cast into doubt or undercut by the withheld material.

Given this overwhelming and intact evidence of appellant's guilt, we are not persuaded by his argument he would have had "a much stronger defense" had he been able to present an alternate perpetrator theory, rather than the theory of self-defense he presented at trial. Appellant's Reply Brief at 5. In this respect, we reject appellant's reliance on the Third Circuit's sharply-divided *en banc* decision in *Dennis*. *See id.* at 6-8; *see also* Appellant's Brief at 27. It is true the majority in *Dennis* held, under the facts of that case, there was a reasonable probability that had the jury heard an "other person" defense based on the withheld material, the result of the proceeding would have been different. *Dennis*, 834 F.3d at 311. As the Third Circuit explained, however, "the documents not only support **an** alternative shooter theory, but **the very same** alternative shooter theory that defense counsel could have been prepared to raise had [additional withheld evidence] also been disclosed." *Id.* (emphasis in original). That other withheld evidence included "a receipt corroborating Dennis's alibi, an inconsistent statement by the Commonwealth's key eyewitness, and [additional] documents indicating that another

individual committed the murder[,]" the cumulative effect of which "effectively gutted the Commonwealth's case against Dennis." *Id.* at 269; *see also id.* at 313 ("The withholding of the *Brady* material would have given defense counsel unique ability to discredit the Commonwealth's primary witnesses, bolster his alibi defense using objective documentary support from a disinterested party, highlight the shoddiness of the Commonwealth's investigation, and perhaps point to another perpetrator."). The facts of *Dennis*, as well as the nature and extent of the withheld evidence involved in that case, are far different from those presented here. And contrary to the Third Circuit's conclusion in *Dennis* that the suppressed evidence there "effectively gutted" the Commonwealth's case, as we have explained, the same cannot be said of the withheld evidence here.[18]

We also reject appellant's suggestion, *see* Appellant's Brief at 37-38, that any withheld evidence that could arguably be used by the accused to present a previously unavailable defense theory, or which might cast doubt upon the integrity of the police investigation, automatically renders it "material" in the constitutional sense. *See Commonwealth v. Chambers*, 807 A.2d 872, 887 (Pa. 2002) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.") (citation omitted). Instead, as we have emphasized above, the law is clear that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable

---

[18] Parenthetically, we note "this Court is bound by decisions of the U.S. Supreme Court, not the opinions of the inferior federal courts." *Commonwealth v. Tedford*, 960 A.2d 1, 15 (Pa. 2008). At the same time, it does not escape us that the Third Circuit's decision in *Dennis* was highly critical of this Court's treatment of certain aspects of federal precedent regarding *Brady* and its progeny. *See, e.g., Dennis*, 834 F.3d at 285 ("[T]he Pennsylvania Supreme Court's decisions . . . rested on unreasonable conclusions of fact and unreasonable applications of clearly established law[.]"). Our analysis herein is mindful of those pointed criticisms.

probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 887-88, *citing Bagley*, 473 U.S. at 682.

On this point, we find the United States Supreme Court's recent decision in *Turner*, *supra*, particularly instructive. *Turner* involved the brutal rape and murder of Catherine Fuller, in what the government believed had been a group attack. 137 S.Ct. at 1889. The withheld evidence in *Turner* included the identities of two men, James McMillan and Gerald Merkerson, whom a witness had seen run into the alley where Fuller was murdered and stop near the garage where she had allegedly been raped. *Id*. at 1891. The defendants argued this information was material because after Fuller's murder, McMillan assaulted and robbed two other women of comparable age in the same neighborhood, and the suppressed information could have suggested McMillan was returning to the scene of the crime to cover his tracks. *Id*. at 1894. More precisely, the defendants argued that with the withheld evidence "they could have raised an alternative theory, namely, that a single perpetrator (or two at most) had attacked Fuller." *Id*. at 1893. The defendants further argued they could have used the withheld evidence "to suggest that an incomplete investigation had ended up accusing the wrong persons." *Id*. at 1894. The Supreme Court found these arguments unpersuasive, relying on the testimony of multiple other government witnesses who affirmed that Fuller had been killed in a group attack, and reasoning that, given the strength of the evidence presented to the jury, the withheld evidence did not undermine confidence in the verdict. *Id*.

The analysis and result in *Turner*, while admittedly bound to the unique facts of that case, supports our conclusion the withheld evidence in this case was not material. Contrary to appellant's claim, it is not enough, for purposes of establishing materiality under *Brady*, to simply allege that the withheld evidence may have opened the door to an otherwise unavailable defense theory, or to challenge the completeness of the police

investigation.[19]  Rather, the linchpin of materiality is whether there exists a reasonable

probability that, had the evidence been disclosed, the result of the proceeding would have

---

[19] The dissent, consistent with Justice Kagan's dissenting position in *Turner*, would hold the Robinson documents material under *Brady*, arguing they are "evidence which, in the hands of competent defense counsel, would have dramatically shifted the course of [appellant]'s defense[,]" and "would have given [appellant] a much greater chance of success."  Dissenting Opinion, slip op. at 11-12.  To the extent the dissent appears to endorse a bright-line rule holding any withheld evidence that could be used to support a new defense theory is *Brady* material, *see id.* at 7-8, *Turner* squarely rejects the notion such a rule exists.  Even assuming the dissent's view is limited to the circumstances of this case, we likewise reject it.  As we have repeated more than a few times, in determining materiality, the law is clear the withheld evidence must be considered in the context of the entire record.  *Turner*, 137 S.Ct. at 1893, *citing Agurs*, 427 U.S. at 112.  Here, that record, which the dissent fails to fully discuss or appreciate, as we have carefully done, consists of overwhelming evidence of appellant's guilt, none of which is affected by the Robinson documents.  Indeed, although the dissent bemoans the "barren evidentiary landscape upon which trial counsel apparently felt compelled to base his case[,]" Dissenting Opinion, slip op. at 10, he fails to acknowledge that landscape is precisely the same even in the face of the new evidence: Havens still unequivocally identified appellant as his armed carjacker; the Johnsons still identified the killer as fleeing in a car similar to Havens's stolen Lincoln, while wearing a lumberjack-style jacket similar to the one inside Havens's car; Price still testified appellant shot the victim and then alleged it was in self-defense; appellant still admitted to a group of fifteen people he killed the victim; appellant still sold the murder weapon shortly after the murder; Havens and Price still testified that recovered gun was identical or similar to the one appellant used in the carjacking and murder; appellant still admitted to Price's girlfriend that he killed the victim and boasted there was no evidence against him; and appellant still evaded police for months, fled when they finally found him, and gave false information regarding his identity upon arrest.  In the context of this unscathed evidence, the withheld evidence does not undermine confidence in the jury's verdict.

Of course, it bears emphasizing the result we reach in this particular case is tethered to these facts, and nothing in this opinion undermines our prior decisions recognizing *Brady*'s materiality assessment extends to consideration of a "defendant's ability to investigate alternate defense theories and to formulate trial strategy."  *Commonwealth v. Ly*, 980 A.2d 61, 76 (Pa. 2009).  But as we further explained in those decisions, consistent with federal precedent, the determinative question for purposes of materiality under *Brady* is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Commonwealth v. Willis*, 46 A.3d 648, 670 (Pa. 2012) (Opinion Announcing the Judgment of the Court).  That is the question we address herein, and we simply conclude, on this evidentiary record, there does not exist a reasonable probability of a different result had the Commonwealth disclosed the Robinson documents.  Thus, the dissent's implication our

been different.  *Id.* at 1893.  As we conclude the withheld evidence in this case does not undermine confidence in the jury's verdict, and there is not a reasonable probability the result of appellant's trial would have been different had it been disclosed, appellant's *Brady* claim does not entitle him to relief.[20]

### C. *Cumulative Effect of Suppressed Evidence*

Before this Court, appellant raises an additional claim that he was prejudiced by the cumulative effect of the Commonwealth's alleged *Brady* violations.  *See* Appellant's Brief at 42-43, *citing Kyles*, 514 U.S. at 436 (cumulative effect of state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief).  The Commonwealth responds this claim is waived because it was

---

decision in this case renders the *Brady* rule "a mere suggestion without consequence[,]" Dissenting Opinion, slip op. at 17, is ill-suited.

[20] Notwithstanding our conclusion the Commonwealth did not violate *Brady*, we stress in the most emphatic terms that we do not condone the Commonwealth's failure to turn over the clearly exculpatory material involved in this case.  It will seldom be the case that a prosecutor's failure to turn over evidence, from whatever source, of another individual's confession to the crime charged against the accused will be deemed immaterial under *Brady*, and we caution the Commonwealth against taking such a retrospective view of materiality.  *See Bagley*, 473 U.S. at 701 (Marshall, J., dissenting) (remarking on the dangers posed by the *Brady* materiality standard, which "invites a prosecutor, whose interests are conflicting, to gamble, to play the odds, and to take a chance that evidence will later turn out not to have been potentially dispositive").  Along these lines, we remind the Commonwealth that it is:

> the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.

*Berger v. United States*, 295 U.S. 78, 88 (1935).  Stated more plainly, "[n]o interest of the State is served, and no duty of the prosecutor advanced, by the suppression of evidence favorable to the defendant."  *Agurs*, 427 U.S. at 116 (Marshall, J., dissenting).

neither preserved before the PCRA court nor included in appellant's Pa.R.A.P. 1925(b) statement of matters complained of on appeal. *See* Commonwealth's Brief at 45-46.

We disagree with the Commonwealth that appellant has waived this claim. True as it is that appellant failed to raise cumulative prejudice as a standalone claim in the court below and in his Rule 1925(b) statement, we agree with appellant that "[a]s a matter of law, a [c]ourt reviewing multiple pieces of exculpatory evidence that the prosecution failed to disclose is required to view the effect of the non-disclosures cumulatively." Appellant's Reply Brief at 11. Indeed, the Supreme Court in *Kyles* instructed that materiality of withheld evidence must be "considered collectively, not item by item." 514 U.S. at 436. *See also Wearry v. Cain*, __ U.S. __, 136 S.Ct. 1002, 1007 (2016) (*per curiam*) ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively[.]"). Thus, we agree with appellant "[t]his is not a waivable claim; it is, rather, the very nature of how a *Brady* claim is required to be reviewed." Appellant's Reply Brief at 11.

On the other hand, we also recognize the precise nature of the claim appellant urges us to consider is the cumulative prejudice created by the Commonwealth's suppression of the "Maculla" note along with the Robinson documents. *See* Appellant's Brief at 42. Given our determination that appellant's *Brady* claim concerning the "Maculla" note is untimely, that evidence is not properly before us, and we therefore decline to consider it in the analysis. We underscore, however, that in addressing appellant's sole timely-raised *Brady* claim concerning the various withheld materials respecting Robinson, we have carefully considered and rejected appellant's cumulative materiality argument, as set forth at length above.

### D. PCRA Court's Evidentiary Ruling[21]

---

[21] As appellant's next claim relates to the evidentiary proceedings conducted below pursuant to his *Brady* claims, we address it out of turn.

Appellant argues the PCRA court abused its discretion when it ruled he was not entitled to materials contained in the files maintained by the Pennsylvania Department of Probation and Parole and the Philadelphia Department of Probation and Parole relating to John McCullough III, the son of John McCullough. *See* Appellant's Brief at 44-49. Appellant stresses that his request "was not a discovery request subject to Pa.R.Crim.P. 902(E)(1)" because he was "not seeking to obtain the information from the prosecutor or its agents[.]" *Id.* at 45. Even if construed as a discovery request, appellant continues, his request satisfied the "exceptional circumstances" requirement of Rule 902(E)(1), as the requested files may have provided him with information he could have used to challenge the witness's motive for testifying, as well as his "drug use and mental health condition." *Id.* at 46-48.

The Commonwealth argues appellant's evidentiary claim is partially waived and meritless in any event. *See* Commonwealth's Brief at 52-56. As to waiver, the Commonwealth notes appellant did not object or ask the PCRA court to set forth its reasoning when it denied appellant's request for the files following its *in camera* review and, thus, "he cannot complain now that the lack thereof somehow supports his challenge[.]" *Id.* at 53. On the merits, the Commonwealth relies on the strict standard for obtaining discovery pursuant to Rule 902(E)(1) and argues the PCRA court acted well within its discretion when it denied appellant's request because the "fact of any probation or parole, including any violations thereof, was already publicly available information" and, therefore, appellant's request "exceeded what would have been reasonable for purposes of establishing possible bias." *Id.* at 54. Moreover, the Commonwealth contends the PCRA court acted appropriately when it denied appellant "the opportunity to turn the limited PCRA discovery mechanisms into an invasion of the witness's mental health and other personal information[,]" much of which appellant successfully elicited through cross-

examination in any event. *Id.* at 55-56. The Commonwealth concludes the PCRA court's decision to hold an *in camera* review "struck an appropriate balance, ensuring that any material relevant to impeachment of John McCullough III was produced while guarding against needless intrusions on the witness's privacy." *Id.* at 56.

Initially, we reject appellant's attempt to recast his request for the witness's records as anything other than a discovery request governed by Rule 902. As the Commonwealth points out, appellant offers no support for his proposed limitation on the definition of "discovery" in the PCRA context to materials obtained directly from the police or district attorney's office, as opposed to those in the custody of other Commonwealth agencies or even non-governmental entities. *See* Commonwealth's Brief at 55 n.24. And, in fact, this Court has previously construed medical records, which are maintained by entities completely divorced from the Commonwealth, pursuant to the discovery provisions of Rule 902(E). *See, e.g.*, *Commonwealth v. Keaton*, 45 A.3d 1050, 1094 (Pa. 2012) (upholding PCRA court's denial of discovery motion that "essentially requested wholesale discovery of police **and medical records**") (emphasis added). Accordingly, we conclude appellant's claim is properly reviewed under the standards for obtaining discovery pursuant to Rule 902(E)(1).

Viewed under these standards, we conclude the PCRA court did not abuse its discretion in denying appellant's request for the witness's probation and parole files. *See Commonwealth v. Bryant*, 855 A.2d 726, 749-50 (Pa. 2004) ("We review the denial of a discovery request in post-conviction proceedings for an abuse of discretion."). Appellant's discovery request was overly broad, and much of the impeachment material he hoped to find was publicly available or could have been obtained by less obtrusive means. Under these circumstances, the PCRA court did not abuse its discretion by holding an *in camera* review and otherwise denying appellant's overly-broad discovery request. *See generally*

*Commonwealth v. Sattazahn*, 952 A.2d 640, 662 (Pa. 2008) (under less stringent "good cause" standard governing discovery for first PCRA petitions in capital cases, a petitioner must make "more than just a generic demand for potentially exculpatory evidence that might be discovered if the petitioner is permitted to review requested materials"); *Commonwealth v. Collins*, 957 A.2d 237, 271-72 (Pa. 2008) (rejecting "sweeping requests" for PCRA discovery under "good cause" standard); *Commonwealth v. Williams*, 732 A.2d 1167, 1175 (Pa. 1999) (petitioner "failed to establish any specific ground that would warrant his broad-based discovery request").[22]

## IV. Constitutionality of 42 Pa.C.S. §9711(d)(9)

In his final claim, appellant argues that because the language of 42 Pa.C.S. §9711(d)(9) (significant history of violent felony convictions aggravator) is "materially indistinguishable" from the residual language of the federal Armed Career Criminal Act (ACCA), 18 U.S.C. §924(e)(2)(B)(ii) — which was ruled unconstitutional by the United States Supreme Court in *Johnson* and made retroactive by *Welch* — his death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution. Appellant's Brief at 43. Appellant recognizes this claim is untimely under this Court's recent decision in *Commonwealth v. Spotz*, 171 A.3d 675, 681-82 (Pa. 2017) (explaining "the (d)(9) aggravator must have been held unconstitutional at the time" the petition is filed), but asserts he raises the issue solely "to preserve it for federal review." Appellant's Brief at 44. As appellant correctly concedes, *Spotz* precludes our exercise of jurisdiction

---

[22] Our conclusion that no relief is due on this claim is further supported by the fact that this issue arose in the context of a hearing on appellant's *Brady* claim concerning the "Maculla" note, which we have already held was untimely in the first place.

over his present challenge to the constitutionality of the Section 9711(d)(9) aggravator, and we therefore need not need discuss it further.[23]

## V. Conclusion

Having concluded that appellant's claims in his third PCRA petition and the multiple supplements thereto are either time-barred or lack merit, we affirm the order of the PCRA court dismissing appellant's serial petition.

Chief Justice Saylor and Justices Baer, Todd and Mundy join the opinion.

Justice Wecht files a dissenting opinion in which Justice Donohue joins.

---

[23] We note that in his reply brief, appellant argues the recent opinion by the United States Supreme Court in *Sessions v. Dimaya*, __ U.S. __, 138 S.Ct. 1204 (2018), "which made clear that the new test announced in *Johnson* extends to similarly worded though not textually identical statutes, calls into question the decision in *Spotz*." Appellant's Reply Brief at 13. This argument was not presented to the court below; consequently, we decline to address it.