J-S02031-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMEER MURPHY | : | |
| | : | |
| Appellant | : | No. 512 EDA 2025 |

Appeal from the PCRA Order Entered February 13, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005908-2015

BEFORE: NICHOLS, J., MURRAY, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED APRIL 2, 2026**

Appellant, Ameer Murphy, appeals from the order denying his second and third petitions for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. Appellant argues that he satisfied an exception to the PCRA time bar and contends that he is entitled to relief pursuant to ***Brady v. Maryland***, 373 U.S. 83 (1963). After review, we affirm.

This Court previously summarized the facts underlying this matter as follows:

On March 16, 2015, just before 10:00 p.m., Leon Williams [(Williams)] sat on his porch at 6053 Irving Street in West Philadelphia, between 60th and 61st Streets. As he sat on the porch smoking cigarettes, he noticed his nephew, … Marquan Royster [(the decedent)], approaching him from the opposite side of Irving Street via 61st Street. After Williams called out, "Hey Nephew!" to the decedent, Appellant … and an unidentified individual walked onto the block from 61st Street and started following the decedent. In response, the decedent began to jog away from the pair. After the three passed Williams' home,

Appellant and his accomplice drew laser-sighted pistols and fired what Williams thought was three to four shots at the decedent in the middle of the street. As the decedent lay dying, Appellant and his accomplice turned around, ran past Williams' house for a second time, entered a red vehicle parked on 61st Street, and drove away. Williams saw Appellant's face after Appellant passed by the home for a second time.

From his living room at 6052 Irving Street, across the street from Williams' home, Norman Gay [(Gay)] heard gunfire as he watched television. After going onto his porch to investigate, Gay observed Appellant and his co-conspirator, wearing sweatshirts and hoodies, run towards his house from the middle of the street to the [] sidewalk, carrying laser-sighted pistols in their hands. As he ran past Gay's home, Appellant's hood came off his head, permitting Gay to observe [Appellant's] face as he approached and ran under a streetlight. After Appellant reached the front stairs onto Gay's porch, Gay's wife pulled him inside the home. Minutes later, Gay returned to the porch and observed a crowd in the middle of the street.

At 9:54 p.m., Philadelphia Police Officer Gary Mercando and Sergeant Mirriam Joseph received a radio call for a shooting near 60th and Irving Streets. Upon arrival, the officers worked their way through a crowd of about eight people to the decedent's body, which lay face down in the middle of Irving Street. After discovering that the decedent was non-responsive, the officers carried him into the back of their squad car and drove him to Presbyterian Hospital, where he was pronounced dead.

Dr. Edwin Lieberman, a forensic pathologist formerly with the Philadelphia Medical Examiner's Office, performed the decedent's autopsy and generated a report. The decedent suffered two gunshot wounds, including a perforating gunshot wound to the rear-left side of his head, which was immediately fatal, and a perforating gunshot wound to his right shin. Each gunshot wound was consistent with the decedent running away from his assailants. Assistant Medical Examiner Dr. Khalil Wardak, an expert in forensic pathology, conducted an independent review of Dr. Lieberman's report and photographs associated with the instant offense. At trial, Dr. Wardak testified, to a reasonable degree of medical certainty, that the manner of death [was] homicide, caused by a gunshot to the back of the head.

Officer Michael Lombardi arrived at Irving Street shortly after the shooting and secured the area. There, he discovered five fired cartridge casings ("FCCs") on the street. The Philadelphia crime scene unit ultimately recovered three .380 caliber FCCs and four .45 caliber FCCs and one .3[80] caliber [] and .45 [caliber] projectile, respectively. Ann Marie Barnes, an expert in ballistics, reviewed the ballistics recovered from the scene and determined that each .380 caliber FCC and each .45 caliber FCC were fired from the same weapon for each respective caliber.

Homicide detectives Frank Mullen and Thorsten Lucke recovered a surveillance video from the Baez Grocery Store on 61st Street near the scene of the shooting. While the video did not show the shooting itself, it does show a red vehicle parking near Irving Street before the shooting, and the decedent walking out of the store immediately prior to the shooting.

At approximately 11:37 p.m. on [the night of the shooting], Appellant arrived at the Camden Medical Center in Camden, New Jersey, suffering from a gunshot wound to the foot. After he arrived, Officer Jeffrey Kostopolis of the Camden City Police Department interviewed [Appellant], who identified himself as Quateer Brown, and gave an address of 3133 Tasker Street in South Philadelphia. At the hospital, Appellant explained that he was waiting for his paramour[,] Jevana Robinson [(Robinson),] at 4th and Erie Streets in Camden, where he was shot in the foot and after which Robinson drove him to the hospital. Camden City Police investigated the area around 4th and Erie and discovered no evidence of a shooting.

In March 2015, Philadelphia homicide detectives received information identifying a phone number associated with Appellant. Detective John Verrecchio [(Detective Verrecchio)] prepared a search warrant for the phone number (215) 251-3547, associated with Appellant[,] and on March 31, 2015, Detective Verrecchio received the cell phone records. Detective Thorsten Lucke also reviewed the records and discovered that at 7:15 p.m. on March 16, 2015, the user of the cell phone texted an unidentified contact, "This is Meer Meer."[1] The phone further contained selfies of Appellant and a photo of Appellant in the hospital with a foot wound. The internet search history of the phone also revealed

_____

[1] Testimony at trial reflected that people refer to Appellant as "Meer Meer." N.T., Trial, 4/5/18, at 24-25, 65, 133.

that the user, on March 17, 2015, searched for a news article concerning the instant shooting. The [p]hone's user history was further littered with images of dirt bikes and pornographic videos. At 6:00 a.m. on April 1, 2015, Philadelphia police officers obtained and executed a search warrant for Appellant's home at 3138 Tasker Street in South Philadelphia. There, officers recovered the iPhone 5c associated with the (215) 251-3547 number and detained Appellant to question him at the homicide unit within the Police Administration Building. That morning, homicide detective Thomas Gaul **_Mirandized_**[1] and interviewed Appellant, who gave detectives consent to search the phone.

[1] **_See Miranda v. Arizona_**, 384 U.S. 436 (1966) ([providing that] a defendant subject to custodial interrogation must be advised of his constitutional right to remain silent and his right to a lawyer in clear and unequivocal language).

During the interview, Appellant denied any involvement in the homicide, but explained to the detective that the decedent was killed in retaliation for the murder of [Appellant's] best friend Damien James [(James)]. Appellant further claimed that he shot himself on the corner of 25th and Moore Streets in South Philadelphia, that he went to Camden, New Jersey[,] for medical treatment, and gave doctors a fake name while he was there, but did not explain why. Detective Gaul examined police reports for that night and discovered a complaint about two males who were shot on the 1600 block of South Taylor Street in South Philadelphia.

At 8:00 p.m. that evening, Detective Verrecchio re-**_Mirandized_** Appellant and conducted a second interview. Then, Appellant described how he was in South Philadelphia at the time of the shooting, and that there was an ongoing conflict between a group of males from 20th Street against a group from 24th Street. Appellant identified himself as a member of the 20th Street group[] and described the decedent as a member of the opposing faction. James, whose death Appellant described as a catalyst for the conflict between the groups and the instant shooting, was a member of the 20th Street group with Appellant.

Before the interview, Detective Verrecchio examined the phone records for the 3547 number, which contained geolocation information for each phone call. By entering the coordinates into a Google Maps search, Detective Verrecchio was able to create a

map for each phone call, demonstrating that the user was in West Philadelphia near [] 61st and Irving Streets at the time of the shooting. When Detective Verrecchio confronted Appellant with this map during the interview, Appellant exclaimed that "[his] life [was] over," and asked Detective Verrecchio if [Appellant] could [accept culpability for] the whole case himself without naming any other associates. After further questioning, Appellant refused to sign a written statement, but Detective Verrecchio prepared his own summary of the interview.

After Appellant's arrest, Detective James Dunlap, an expert in cell phone tower analysis, analyzed the records for the phone associated with Appellant and identified more than three dozen connections on March 16, 2015. Between 7:50 p.m. and 9:21 p.m., the phone associated with Appellant made seven connections at the tower located at 63rd and Walnut Streets, near the scene of the shooting. At 9:53 p.m., the phone associated with Appellant made a call from a different sector of the same tower. From 9:56 p.m. to 10:05 p.m., the phone travelled from a series of towers further west, connecting with towers in Upper Darby, Pennsylvania, the 6700 block of Baltimore Avenue in West Philadelphia, 58th and Springfield Streets, and on 67th and Essington Streets. By 10:19 p.m., the phone connected with a tower on Passyunk Avenue in South Philadelphia. Between 10:19 and 11:18, the phone connected with numerous towers in an area between Broad Street and Interstate 76 west east to west [sic] and from South Street down to Passyunk Avenue north to south.

At 11:27 p.m., the phone connected with a tower in Camden, New Jersey, near the Camden Medical Center. At trial, Detective Dunlap testified that the time and location of the connections indicate that the use of the phone was in the area of the shooting at the time it occurred, and then was inside a vehicle that travelled between the identified towers.

At trial, Appellant's mother, Questina Woods [(Woods)], testified that the 3547 numbered phone belonged to her daughter, but that [Woods] was in possession of the phone on the evening of the shooting, and the phone was in [Woods'] possession while she was visiting a prospective new home at 57th and Hazel Avenue in West Philadelphia, blocks from where the shooting occurred. On cross-examination, when confronted about pornography discovered on the phone, Woods testified that she often used her phone to search for pornography, but could not explain answers

to text messages identifying the user as "Meer Meer," [which is] Appellant's nickname.

Appellant elected to testify at [his jury] trial and explained that he was at 24th and Morris Streets from 6:00 to 10:30 p.m. Then, while Appellant and his friend Lawrence Shiver sat in a Buick LeSabre, an unidentified vehicle pulled up next to them and fired into the passenger compartment, striking Appellant in the foot. After that shooting, Appellant went to Woods' home, and had her drive him to a hospital in Camden, New Jersey. Appellant elected to check into a New Jersey hospital and provided a pseudonym, he explained, because he feared being arrested for a probation violation if he treated his wound in Philadelphia. Appellant further claimed that Woods had the 3547 numbered cell phone from 6:00 p.m. until [Appellant's] arrival at the Camden Medical Center.

*Commonwealth v. Murphy*, 2263 EDA 2021, 2023 WL 3034357, *1-4 (Pa. Super. filed April 21, 2023)(unpublished memorandum)(some formatting altered and citation omitted).

In April 2015, the Commonwealth charged Appellant with murder and related offenses. Prior to trial, on January 8, 2018, the Commonwealth offered Appellant a negotiated plea of an aggregate 25 - 50 years in prison, in exchange for pleading guilty to third-degree murder, conspiracy, and firearms offenses. As discussed below, Appellant repeatedly rejected the offer, which the trial court confirmed in a colloquy on the record. *See* N.T., 1/8/18, at 40-44, *infra*; N.T., 4/2/18, at 12-18, *infra*.

The case proceeded to trial in April 2018. George S. Yacoubian, Esquire (Trial Counsel), represented Appellant. On April 6, 2018, the jury found Appellant guilty of first-degree murder, conspiracy to commit murder, possession of an instrument of crime, and two firearms offenses. The trial court sentenced Appellant to life in prison that same day. Appellant did not file post-sentence motions.

Appellant filed a direct appeal claiming the trial court erred in admitting a witness's prior written statement into evidence. This Court rejected Appellant's claim and affirmed the judgment of sentence. Appellant petitioned for allowance of appeal, which the Pennsylvania Supreme Court denied. *Commonwealth v. Murphy*, [2020 WL 1242442,] 227 A.3d 311 (Pa. [filed March 16,]

2020). Appellant did not seek review with the United States Supreme Court.

*Id.* at *4 (citation omitted).

On June 9, 2021, Appellant filed his first PCRA petition, which was denied by the PCRA court. Appellant filed an appeal, and this Court affirmed the PCRA court's order denying the petition. *Id.* at *12. The Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Murphy*, 2023 WL 6632224, 305 A.3d 955 (Pa. filed October 12, 2023).

In Appellant's second PCRA petition, he asserted that a videotape of Detective Verrecchio's interview of Norman Gay, recorded on March 31, 2015, was not turned over to Appellant. Second PCRA Petition, 6/15/24, at 12. Appellant subsequently filed what he titled a Supplemental Second PCRA petition, which we will refer to herein as his third PCRA petition,[2] asserting that he had obtained information that Mr. Gay believed there was a reward for identifying the perpetrator in this matter, and that, after Appellant's trial, Mr. Gay inquired about the reward. Third PCRA Petition, 8/28/24, at 2-3. Appellant argued that he satisfied an exception to the PCRA time bar by

_____

[2] *See* Pa.R.Crim.P. 905(A) (amendment is permitted only by directive or leave of the PCRA court); *Commonwealth v. Porter*, 35 A.3d 4, 12 (Pa. 2012) (stating that a subsequent petition, even though labeled "supplement and amendment[,]" did not constitute an amended petition where "there [was] no indication that ... the PCRA court ever granted[ ] leave to amend the [original] petition"). Accordingly, we shall refer to Appellant's Supplemental Second PCRA Petition as his third PCRA petition.

establishing newly discovered facts and governmental interference. Second PCRA Petition at 6-12; Third PCRA Petition at 5-11.

On December 5, 2024, the PCRA court held a hearing to permit Appellant the opportunity to argue both the timeliness of his PCRA petitions and the merits of his claims. Following the hearing, the PCRA court filed an order and opinion on February 13, 2025. The PCRA court concluded that Appellant's first issue, in which he argued that he had discovered that there was a videotape of Detective Verrecchio's March 31, 2015 interview of Mr. Gay that had not been turned over to Appellant, satisfied the newly discovered fact exception to the PCRA time bar. Order and Opinion, 2/13/25, at 9. Accordingly, the PCRA court deemed Appellant's second PCRA petition timely with respect to Appellant's first issue. *Id.* However, the PCRA court concluded that Appellant was not entitled to PCRA relief because the video would not have compelled a different result at trial due to the overwhelming evidence of Appellant's guilt. *Id.* at 10. Additionally, the PCRA court concluded that the claim Appellant raised in his Third PCRA Petition concerning Mr. Gay's inquiry into a possible reward for his testimony was untimely because no exception to the PCRA time bar applied, and, regardless, Mr. Gay's only contact with the District Attorney's office occurred after trial, which nullified the Commonwealth's duty to disclose this information under *Brady*. *Id.* Accordingly, the PCRA court denied Appellant's petitions. *Id.*

Appellant filed a timely appeal with an accompanying Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On appeal, Appellant presents the following issues:

A. Did the PCRA court err in dismissing the claim that the Commonwealth's failure to disclose Detective Verrecchio's March 31, 2015 videotaped interview of eyewitness Norman Gay, in which he unduly suggested to Gay that his identification of [Appellant] was "correct" and took other actions to cement in Gay's mind that [Appellant] was the perpetrator, violated the Due Process Clause of the Fourteenth Amendment and the dictates of *Brady v. Maryland* (1963)?

B. Did the PCRA court err in dismissing the claim that the Commonwealth's failure to disclose its offer to reward money to witnesses like Norman Gay who provided information leading to the arrest and conviction of those responsible for the murder of Marquan Royster violated the Due Process Clause of the Fourteenth Amendment and the dictates of *Brady v. Maryland* (1963), a material lapse because Gay was aware of the reward money when he identified [Appellant] and testified and because the jury could have rightly concluded that Gay's testimony was motivated by his financial interest in the outcome of the case…?

C. Did the PCRA court err in dismissing the claim that the cumulative effect of both the undisclosed videotape and the undisclosed reward money establishes the materiality prong of *Brady* even if individually they do not?

Appellant's Brief at 7 (formatting altered).

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *Commonwealth v. Ragan*, 923 A.2d 1169, 1170 (Pa. 2007). The timeliness of a PCRA petition is a threshold jurisdictional question. *See Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa. Super. 2014); *see also Commonwealth v. Ballance*,

- 9 -

203 A.3d 1027, 1031 (Pa. Super. 2019) (stating that "no court has jurisdiction to hear an untimely PCRA petition"). A judgment of sentence becomes final at the conclusion of direct review, or at the expiration of time for seeking such review. ***Commonwealth v. Jones***, 54 A.3d 14, 17 (Pa. 2012). Under the PCRA, any petition for post-conviction relief, including a second or subsequent one, must be filed within one year of the date the judgment of sentence becomes final, unless one of the following exceptions set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii) applies:

**(b) Time for filing petition.--**

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii). Any petition attempting to invoke one of these exceptions must "be filed within one year of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2).

- 10 -

> Further, the newly discovered facts exception, as well as the requirements of Section 9545(b)(2) of the PCRA, are claim specific, not petition based. ***See*** 42 Pa.C.S. § 9545(b)(1)(ii) (providing that, to meet newly discovered facts exception, petitioner must plead and prove that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of *due diligence*" (emphasis added)); ***see Commonwealth v. Porter***, 35 A.3d 4, 13-14 (Pa. 2012) (describing Sections 9545(b)(1) and (2) of the PCRA as "claim specific …"). Thus, when … a facially untimely PCRA petition presents various claims and invokes the newly discovered facts exception, a court can only consider the merits of the claims that meet the exception and Section 9545(b)(2)'s filing mandates. ***See Commonwealth v. Tedford***, 228 A.3d 891, 904 (Pa. 2020) ("This Court has consistently held that the PCRA's time restrictions are jurisdictional in nature and that a PCRA court must, before considering the merits of claims asserted in a PCRA petition, first make a threshold determination whether *each* claim was timely filed." (emphasis added)). In other words, if one of several claims in a PCRA petition meets this exception and Section 9545(b)(2), that does not mean that a PCRA court has jurisdiction to entertain the other claims raised in that petition. Rather, the court can consider the additional claims only if they meet the requisites of the exception and Section 9545(b)(2).

***Commonwealth v. Rivera***, 324 A.3d 452, 468–69 (Pa. 2024)(some formatting altered).

Appellant concedes that his PCRA petitions were patently untimely. For ease of discussion, we separately analyze whether Appellant adequately pled and proved an exception to the time-bar.[3]

**I.**

---

[3] Appellant's judgment of sentence became final in June of 2020, 90 days after the time expired to pursue a writ of certiorari in the United States Supreme Court after the Pennsylvania Supreme Court denied further review in Appellant's direct appeal. Accordingly, Appellant's June 15, 2024 PCRA petition was untimely, and the PCRA court lacked jurisdiction to address Appellant's claims unless Appellant pled and proved an exception set forth in 42 Pa.C.S. § 9545(b)(1)(i)-(iii).

- 11 -

In Appellant's second PCRA petition, he invoked the newly discovered evidence and government interference exceptions, alleging that he discovered a videotape of Detective Verrecchio's interview of Norman Gay. Appellant argues that there was a videotape of Detective Verrecchio's interview of Norman Gay that was not turned over to Appellant, and that Appellant did not discover the existence of this videotape until April 4, 2024. Appellant's Brief at 24. As noted, Appellant does not dispute that his second PCRA petition was patently untimely. *Id.* The PCRA court concluded that on the claim concerning the videotape, Appellant satisfied an exception to the time bar. Order and Opinion, 2/13/25, at 9.

Because it impacts our jurisdiction, we first address the PCRA court's determination that Appellant satisfied an exception to the PCRA time bar with respect to his first petition concerning the videotaped interview of Norman Gay. *See Rivera*, 324 A.3d at 468–69 (stating that whether a petitioner established an exception to the PCRA time bar is determined with respect to each individual issue); *Ballance*, 203 A.3d at 1031 (stating that "no court has jurisdiction to hear an untimely PCRA petition").

In its order and opinion, the PCRA court addressed Appellant's argument that he established an exception to the PCRA's timing requirements as follows:

> [Appellant] satisfies the timeliness exception for the video claim, since he first learned about the video of Gay's interview on April 4, 2024, he could not have obtained the video earlier by the exercise of due diligence, and he raised the claim within one year of the date he first learned of the video's existence, on June 15, 2024.

Order and Opinion, 2/13/25, at 9. The PCRA court provided no further findings or discussion on this jurisdictional issue.

After review, we conclude as a matter of law that the PCRA court erred in finding that Appellant satisfied the newly discovered evidence exception.[4] Appellant argues that Appellant's prior counsel, Lee Mandell, Esq., and George Yacoubian, Esq., testified at Appellant's December 5, 2024 PCRA hearing that they did not recall viewing the video. Appellant's Brief at 24. We note that although Attorney Yacoubian and Attorney Mandell testified at the hearing on Appellant's second PCRA petition that they did not recall seeing the video of Mr. Gay's interview, *see* N.T., 12/5/24, at 16, 21, 53, neither Attorney Yacoubian nor Attorney Mandell was Appellant's counsel of record when the record reflects that discovery, including the video, was passed from the Commonwealth to Appellant. Indeed, the Commonwealth points out that there is a July 22, 2015 discovery letter from the Commonwealth that was sent to Brian McMonagle, Esq., who was Appellant's trial counsel at the time. *See* Commonwealth's Motion to Dismiss Second PCRA Petition, 8/20/24, at 12, n.11; Exhibit A (Discovery Letter, 7/22/15). The discovery letter indicates that a video of Mr. Gay's interview was turned over to Attorney McMonagle. *Id.* The Commonwealth notes that while it is possible that Attorney McMonagle did not provide Attorney Yacoubian and Attorney Mandell the

_____

[4] However, we note that this Court may affirm the PCRA court's ruling on any correct basis if the record supports it. **Commonwealth v. Diaz**, 183 A.3d 417, 421 (Pa. Super. 2018).

- 13 -

video, the record nevertheless reflects that the Commonwealth did turn over the video to Appellant's counsel of record at the time. *Id.* (Exhibits A, B, and C).

The PCRA court does not provide any analysis or credibility determinations regarding whether the video was passed to Appellant's trial counsel or discuss when Appellant could have first learned of the videotape through the exercise of due diligence. After careful review, we conclude that the record does not support the conclusion that Appellant could not have discovered videotape earlier through due diligence. Accordingly, we conclude that Appellant failed to establish the newly discovered fact exception to the PCRA's time bar, and therefore, we conclude that Appellant's petition was untimely as to this issue. *See Rivera*, 324 A.3d at 468-69 (stating that establishing an exception to the PCRA's time bar is specific to each individual claim). We similarly conclude that Appellant failed to establish the government interference exception as the record does not reflect any such interference.

In any event, even if Appellant had established an exception to the PCRA's time bar on this first issue, we would agree with the PCRA court's conclusion that no relief is due. To succeed on a *Brady* claim, the defendant must establish: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently; (2) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; and (3) prejudice ensued. *Commonwealth v. Sandusky*, 203 A.3d 1033, 1061 (Pa.

Super. 2019) (citation omitted). "A **Brady** violation exists only where the suppressed evidence is material to guilt or punishment, *i.e.*, where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." **Commonwealth v. Cousar**, 154 A.3d 287, 301 (Pa. 2017). A reasonable probability of a different result is demonstrated when the government's suppression of evidence undermines confidence in the result of the trial. **Id.** (citing **United States v. Bagley**, 473 U.S. 667 (1985)). Finally, where the evidence against the appellant is overwhelming, there is no reasonable probability that if the Commonwealth turned over evidence at issue the result of the trial would have been different. **Commonwealth v. Natividad**, 200 A.3d 11, 33 (Pa. 2019).

The PCRA court concluded that Appellant was not entitled to PCRA relief because he cannot establish prejudice under the substantive aspects of the **Brady** claim Appellant wished to pursue if his petition were deemed timely. As the PCRA court explained, the evidence of Appellant's guilt was overwhelming and the result of the proceeding would not have been different:

> Assuming that the interview video of Gay was suppressed by the Commonwealth, the claim would not likely compel a different verdict if it were disclosed before trial. As the Superior Court noted in its October 21, 2019[ Memorandum], the evidence of [Appellant's] guilt was overwhelming. [**See Commonwealth v. Murphy**, 1301 EDA 2018, 2019 WL 5307043, at *5 (Pa. Super. filed October 21, 2019) (unpublished memorandum) (stating "the Commonwealth presented overwhelming evidence of Appellant's guilt").] Gay identified [Appellant] as the shooter in a double blind photo array administered by Detective Angela Gaines on March 30, 2015, a day before his interview with Detective Verrecchio. Leon Williams identified [Appellant] as the shooter in a photo

- 15 -

array with police, at the preliminary hearing, and at trial. [Appellant's] cell phone was at the location of the murder at the time [the murder] occurred. The phone contained selfies of [Appellant] and text messages sent from "Meer Meer" a few hours before the shooting. N.T. 4/4/2018 at 144-145.

The phone's geolocation records showed the phone was brought back to [Appellant's] home after the shooting and eventually taken to a Camden hospital, where [Appellant] admittedly checked in with a gunshot wound to his foot. [Appellant] gave a fake name to the Camden medical personnel, and indicated that he had been shot in Camden; however, Camden police found no evidence of a shooting in the area. When confronted with his phone records, [Appellant] exclaimed that his "life [was] over" and indicated that he would take responsibility for the murder if no one else was prosecuted. [N.T., Trial,] 4/4/2018 at 97. Moreover, the evidence showed that [Appellant] had a motive to kill the decedent; [Appellant] admitted that the victim was a member of a rival gang who was suspected to have murdered [Appellant's] best friend. Given this overwhelming evidence, [Appellant] suffered no prejudice as a result of the nondisclosure of this video. **Commonwealth v. Natividad**, 200 A.3d 11[, 33] (Pa. 2019) (overwhelming other evidence of guilt outweighed potential withheld evidence in denying **Brady** claim); **Commonwealth v. Cam Ly**, 980 A.2d 61 (Pa. 2009).

Order and Opinion, 2/13/25, at 10 (some formatting altered). **See also Murphy**, 1301 EDA 2018, 2019 WL 5307043, at *5 (concluding that the evidence of Appellant's guilt was overwhelming); **Murphy**, 2263 EDA 2021, 2023 WL 3034357, at *12 (same).

## II.

In his second issue, which addresses whether his third PCRA petition was timely, Appellant argues that the Commonwealth failed to disclose that Norman Gay inquired about a reward regarding his trial testimony. Appellant's Brief at 37. Appellant contends that in raising this issue, he satisfied the newly discovered fact and government interference exceptions to the PCRA time bar.

*Id.* Appellant argues that the Commonwealth had an affirmative duty to disclose this information to Appellant. *Id.* at 38.

Once more, because it impacts our jurisdiction, we first address the timeliness of Appellant raising this claim in his third PCRA petition. *See Rivera*, 324 A.3d at 468–69; *Ballance*, 203 A.3d at 1031. As stated, Appellant filed his third PCRA petition on August 28, 2024. Because we determined that Appellant's judgment of sentence became final in June of 2020 for purposes of the PCRA, Appellant's third PCRA petition is facially untimely.

Appellant contends that he satisfied the newly discovered facts and government interference exceptions to the PCRA time bar. Appellant's Brief at 38. The PCRA court disagreed, and it concluded that Appellant's petition was untimely with respect to this issue. Order and Opinion, 2/13/25, at 11. The PCRA court explained:

> [Appellant's] second claim regarding Gay's inquiry into a possible reward cannot satisfy any timeliness exception as he has not established a new fact nor demonstrated any government interference. Contrary to [Appellant's] claim, Gay made clear that his only contact with the Commonwealth regarding his possible eligibility for a reward happened after trial, thus nullifying any need for disclosure [by the Commonwealth]. This aligns with Gay's signed statement, in which he confirmed that he called the District Attorney's Office after the trial to inquire about the reward money.
>
> Even if this second claim is viewed as timely, it likewise fail[s] on the merits. Gay did not pursue any potential reward money until after trial, thus there would be no duty to disclose. Even if Gay had inquired of the District Attorney's Office during trial, any failure to disclose that information to [Appellant] would lack the

prejudice necessary to afford him relief, given the other evidence of his guilt.

*Id.*

The PCRA court appears to have reached the ***Brady*** analysis without first determining whether Appellant satisfied an exception to the PCRA time bar. However, the jurisdictional analysis precedes a merits analysis. ***See Commonwealth v. Bennett***, 930 A.2d 1264, 1271 (Pa. 2007). Here, Appellant asserted that he first learned on August 25, 2024, that Mr. Gay investigated the possibility of a reward, and that Appellant filed his third PCRA petition only three days later on August 28, 2024. Accordingly, we first look to see if Appellant established a time-bar exception. *Id.* Here, Appellant argues that the information concerning Mr. Gay inquiring about a reward was not available to Appellant earlier through the exercise of due diligence, and Appellant filed his third PCRA petition within one-year of when he first learned of the information.

We conclude that Mr. Gay's inquiry concerning a possible reward was unknown to Appellant, as the record supports the conclusion that Mr. Gay contacted only the District Attorney's Office. Further, because this information existed only within the District Attorney's Office, it was not reasonably ascertainable by Appellant through the exercise of due diligence. 42 Pa.C.S. § 9545(b)(1)(ii); ***see also Commonwealth v. Cox***, 146 A.3d 221, 230 (Pa. 2016) (citation omitted) (providing that due diligence "does not require perfect vigilance and punctilious care, but merely a showing the party has put forth reasonable effort" to obtain the information upon which a claim is

based"). We therefore conclude that Appellant satisfied a time-bar exception regarding this issue, and, as such, we have jurisdiction to address the merits of his claim.

However, as noted by the PCRA Court, Appellant's underlying **Brady** claim fails on the merits. The record reflects that at the December 5, 2024 PCRA hearing, Appellant's PCRA counsel questioned Mr. Gay about the possibility of a reward:

> Q. And at some point before or during trial, were you aware that you might be eligible to receive reward money for your help identifying the shooters and testifying at trial?
>
> A. Well, that occurred at the end of the trial. Toward the end of the trial, yes.
>
> Q. Okay. And how were you made aware of it?
>
> A. Well, actually, my cousin had called me from Arizona, actually. And it's been -- asked me – you know, I talked to him previously about the case. And it's been two to three weeks, and he had called me back and said, you know, it's possible you can have – you know, there could be money; rewards or whatever. I said nah. I had no idea. And he explained to me that he had seen Crime Stoppers, and that he -- he explained that they -- that they be -- you know, report a crime, and you show up to court, it's possible that there could be a reward. He didn't say definitely that there was one or whatever. I never knew. I never asked him.

N.T., PCRA Hearing, 12/5/24, at 63-64.

Mr. Gay initially testified that he was unsure if he had spoken to anyone from the District Attorney's Office about a reward during the trial. *Id.* at 73-76. However, he then unequivocally stated that he called the District Attorney's office about the possibility of a reward *after* the trial. *Id.* Mr. Gay further clarified when questioned by Appellant's PCRA counsel that any reward

money was not relevant to him, and that he only called the District Attorney's office after the trial. *Id.* at 79, 83-84. On cross-examination by the Commonwealth, Mr. Gay confirmed that he did not contact the District Attorney's office until after the trial to ask about the possibility of a reward. *Id.* at 86-87. Mr. Gay explained that although he called the District Attorney's office, no one called him back and that he testified only because he wanted to do "the right thing."

> Q. And nobody got back to you about that?
>
> A. Right.
>
> Q. Did you file any paperwork about a reward?
>
> A. No.
>
> Q. Okay. And you said you testified because you just wanted to do the right thing; is that correct?
>
> A. Yes.
>
> Q. So you didn't identify [Appellant] in a photo array, or in police statements, or at trial just for the purpose of getting the reward?
>
> A. No.

*Id.* at 87.

After review, we find that the record supports the conclusion that Mr. Gay did not pursue the possibility of a reward until after Appellant's trial, and the record does not reflect any indication that Mr. Gay testified pursuant to an agreement with the Commonwealth or any inducement to testify. The information concerning Mr. Gay's inquiry about a possible reward did not exist at the time of trial because the inquiry had not yet happened. Because Mr. Gay did not inquire about a reward until after the trial, the Commonwealth

could not have suppressed this information.[5]  Therefore, Mr. Gay's inquiry about a possible reward after the trial does not constitute **Brady** material. **See Sandusky**, 203 A.3d at 1061 (stating that to succeed on a **Brady** claim, the defendant must establish, among other things, that the evidence was suppressed by the prosecution).[6]  For this reason, Appellant's second claim of error fails.[7]

_____

[5]  We find persuasive the following discussion from the United States Court of Appeals for the Seventh Circuit:

> Todd cannot prove an agreement existed.  He argues that at the very least Nielson had an "expectation" of benefit.  But what one party might expect from another does not amount to an agreement between them.  And Todd does not argue that the state knew of Nielson's expectation or that he could not have uncovered that expectation with reasonable diligence.  This brings us back to the agreement, which Todd cannot show existed.  Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a **Brady** violation.

**Todd v. Schomig**, 283 F.3d 842, 849 (7th Cir. 2002).

[6] We note that a **Brady** violation may satisfy the governmental interference exception to the PCRA time bar, but the petitioner must plead and prove that the failure to previously raise the **Brady** claim was the result of interference by government officials, and that the information could not have been obtained earlier with the exercise of due diligence.  **Commonwealth v. Williams**, 244 A.3d 1281, 1289 (Pa. Super. 2021).  As discussed above, we conclude that there was no **Brady** violation because there was no evidence suppressed by the Commonwealth, and furthermore, Appellant has not established any interference by government officials.  Accordingly, Appellant cannot establish the government interference exception.

[7]  Appellant does not argue that the Commonwealth's **Brady** obligations required it to disclose the material during post-trial proceedings.

**III.**

In his final claim of error, Appellant contends that cumulative ***Brady*** violations entitle him to relief. Appellant's Brief at 53. We disagree.

We concluded above that Appellant failed to establish an exception to the PCRA time bar with respect to his first issue involving the videotape, and in the alternative noted that even if Appellant satisfied an exception to the PCRA's time bar regarding that issue, there was no prejudice because the evidence of Appellant's guilt was overwhelming. Further, although we concluded that Appellant met an exception to the PCRA time bar with respect to his second issue involving Mr. Gay's inquiry into a possible reward, we concluded that the evidence did not constitute ***Brady*** material because it was not suppressed by the Commonwealth. For these reasons, both claims failed.

This Court has stated that "[n]o number of failed claims may collectively warrant relief if they fail to do so individually." ***Commonwealth v. Saylor***, 308 A.3d 869, 879 (Pa. Super. 2024). However, "[w]hen the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." ***Commonwealth v. Spotz***, 18 A.3d 244, 321 (Pa. 2011). Although herein we noted in the alternative that Appellant's first issue failed due to lack of prejudice, we conclude that, to the extent we have rejected Appellant's first issue based upon a prejudice analysis, we also find that cumulative prejudice is lacking. ***See, e.g., Commonwealth v. Wholaver***, 177 A.3d 136, 180 (Pa. 2018) (stating "[w]e have disposed of [the a]ppellant's issues in a number of

ways …. To the extent that we reject some of [the a]ppellant's issues based upon a prejudice analysis, we also find that collective prejudice is lacking and, thus, deny relief on this issue"). In sum, we conclude that Appellant's claim of cumulative error fails. *Saylor*, 308 A.3d at 879; *Wholaver*, 177 A.3d at 180.

For the reasons set forth above, although we do so on a different basis,[8] we affirm the PCRA court's order denying Appellant's second PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/2/2026

---

[8] *See Diaz*, 183 A.3d at 421 (providing that this Court may affirm the PCRA court on any correct basis if it is supported by the record).